*Attorney Grievance Commission of Maryland v. Ali Mansouri Kalarestaghi*, AG No. 48, September Term, 2021. Opinion by Hotten, J.

**ATTORNEY DISCIPLINE – SANCTIONS – SUSPENSION**

Respondent, Ali Mansouri Kalarestaghi, violated Maryland Attorneys' Rules of Professional Conduct 19-301.4(a)(1) and (b) (Communication) (1.4), 19-301.7 (Conflict of Interest – General Rule) (1.7), 19-301.8(a) (Conflict of Interest; Current Clients; Specific Rules) (1.8), 19-301.9(a) (Duties to Former Clients) (1.9), 19-301.16(a)(1) (Declining or Terminating Representation) (1.16), and 19-308.4(a) and (d) (Misconduct) (8.4). These violations stemmed from Respondent's conflict of interest in the representation of two clients; putting the parties in direct conflict during representation; failing to recognize and advise clients of the conflict of interest; failing to attempt to obtain the clients' informed consent, confirmed in writing, to continue with the representation; entering into a business transaction with a client without advising the client, in writing, of the desirability of seeking advice of independent counsel and without giving the client a reasonable opportunity to do so; representing a client against a former client without obtaining written, informed consent from the former client; and engaging in conduct that is prejudicial to the administration of justice.

Considering the nature of the misconduct and the various aggravating and mitigating factors present, the Supreme Court of Maryland concluded that a sixty-day suspension, stayed in favor of a six-month probationary period with the conditions that Respondent adhere to the Maryland Attorneys' Rules of Professional Conduct and complete a continuing legal education course on conflicts of interest or general ethics, is the appropriate sanction.

Circuit Court for Baltimore County
Case No. C-03-CV-21-004062
Argued: November 3, 2022

IN THE SUPREME COURT

OF MARYLAND*

AG No. 48

September Term, 2021

_____

ATTORNEY GRIEVANCE
COMMISSION OF MARYLAND

v.

ALI MANSOURI KALARESTAGHI

_____

Fader, C.J.,
Watts,
Hotten,
Booth,
Biran,
Gould,
Eaves,

JJ.

_____

Opinion by Hotten, J.
Fader, C.J., Booth, and Gould, JJ., concur
and dissent.

_____

Filed: March 14, 2023

Pursuant to the Maryland Uniform Electronic Legal Materials
Act (§§ 10-1601 et seq. of the State Government Article) this
document is authentic.



Gregory Hilton, Clerk

*During the November 8, 2022, general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Appeals to the Supreme Court of Maryland. The name change took effect on December 14, 2022.

The Attorney Grievance Commission of Maryland, acting through Bar Counsel ("Petitioner"), filed with this Court a Petition for Disciplinary or Remedial Action (the "Petition") against Ali Mansouri Kalarestaghi ("Respondent") pursuant to Md. Rule 19-721.[1] Specifically, Petitioner charged Respondent with violating the following Maryland Attorneys' Rules of Professional Conduct ("MARPC"):[2]

1. Rule 19-301.4(a)(1) and (b) (Communication) (1.4);

2. Rule 19-301.7 (Conflict of Interest – General Rule) (1.7);

3. Rule 19-301.8(a) (Conflict of Interest; Current Clients; Specific Rules) (1.8);

4. Rule 19-301.9(a) (Duties to Former Clients) (1.9);

5. Rule 19-301.16(a) (Declining or Terminating Representation) (1.16); and

6. Rule 19-308.4(a), (c), and (d) (Misconduct) (8.4).

Pursuant to Md. Rule 19-722(a),[3] we referred the matter to the Circuit Court for Baltimore County and designated the Honorable Wendy S. Epstein (the "hearing judge")

---

[1] Maryland Rule 19-721(a)(1) provides, in pertinent part: "Upon approval or direction of the Commission, Bar Counsel, on behalf of the Commission, shall file a Petition for Disciplinary or Remedial Action in the [Supreme Court of Maryland]."

[2] Effective July 1, 2016, the Maryland Lawyers' Rules of Professional Conduct were renamed the Maryland Attorneys' Rules of Professional Conduct and recodified in Title 19 of the Maryland Rules without substantive changes. *Att'y Grievance Comm'n v. Johnson*, 472 Md. 491, 503 n.3, 247 A.3d 767, 774 n.3 (2021). "For simplicity, and because there is no substantive difference in the two codifications of the rules, we shall use the [longer] designations of the [MARPC], *e.g.*, '[Rule 19-301.1].'" *Id.*, 247 A.3d at 774 n.3.

[3] Maryland Rule 19-722(a) provides, in pertinent part: "Upon the filing of a Petition for Disciplinary or Remedial Action, the [Supreme Court of Maryland] may enter an order designating (1) a judge of any circuit court to hear the action, and (2) the clerk responsible for maintaining the record."

to conduct an evidentiary hearing and provide findings of fact and conclusions of law. After a two-day hearing on April 27 and 28, 2022, the hearing judge found clear and convincing evidence that Respondent violated the applicable MARPC as alleged in the Petition. Respondent filed numerous exceptions to the hearing judge's Findings of Fact and Conclusions of Law. This Court heard oral arguments on November 3, 2022.

For the reasons outlined below, we suspend Respondent from the practice of law for sixty days, but with the execution of that disposition stayed for a six-month period of probation, subject to the conditions that: (1) Respondent adhere to the MARPC and (2) complete a continuing legal education course ("CLE") on conflicts of interest or general ethics.

## HEARING JUDGE'S FINDINGS OF FACT

We summarize and, where indicated, quote the hearing judge's findings of fact that have been established by clear and convincing evidence.

### Background

Respondent was admitted to the Maryland Bar in December 2007. At all relevant times, Respondent maintained an office for the practice of law in Catonsville, Maryland. Respondent "focuses his practice on real estate and business law." As the hearing judge found:

> In 2012, Respondent, his father, Mehdi Kalarestaghi (hereafter "Mr. Kalarestaghi"), and his brother, Hossain Kalarestaghi, formed an entity named MAH Mountain, LLC ("MAH Mountain"), a family business created with the intention of purchasing one or two properties to redevelop them. The Respondent is a 30% owner of MAH Mountain. In 2012, MAH Mountain purchased a two-story multi-unit commercial retail property located at 6567 Baltimore National Pike, Catonsville, Maryland (the

2

"Baltimore National Pike [P]roperty") with the purpose of leasing retail space to commercial tenants.

Respondent does not have a "specific role" or title at MAH Mountain, but testified that his position was akin to that of an attorney. In his capacity as an attorney for MAH Mountain, "Respondent drafted and negotiated leases for the temporary tenants who were in the property after they purchased it and then for any subsequent tenants when the renovations were completed."

### Representation of Catonsville Eye

Peepers Family Eye Care ("Peepers") is an optometry practice owned and operated by Dr. Norman Fine and Dr. Erick Gray. Dr. Gray "focuses on the administrative aspects of the business[]" while Dr. Fine "focuses on patient care." Dr. Gray expanded Peepers' practice by opening roughly eight stores, including Catonsville Eye Associates, LLC ("Catonsville Eye"). In this capacity, Dr. Gray has experience with commercial leases but always used his own attorney to review each lease.

In February 2012, Catonsville Eye leased a commercial space on Rolling Road in Catonsville ("Rolling Road"). The lease was originally set to expire in September 2017; however, Catonsville Eye executed an addendum extending the lease to December 2017. In 2016, Drs. Gray and Fine sought to relocate Catonsville Eye. In December 2016, Drs. Gray and Fine saw an advertisement for available commercial rental space at the Baltimore National Pike Property, which, at the time, was under construction. Dr. Gray subsequently called the number listed on the advertisement and spoke with Mr. Kalarestaghi.

3

Respondent, Dr. Gray, Dr. Fine, and Mr. Kalarestaghi met in December 2016 "to discuss the possibility of Catonsville Eye leasing space from MAH Mountain." Respondent introduced himself as Mr. Kalarestaghi's son and attorney but neglected to inform Drs. Gray and Fine that he owned a thirty-percent interest in MAH Mountain. During the meeting, Drs. Gray and Fine informed Respondent and Mr. Kalarestaghi about their current lease at the Rolling Road location:

> [A]lthough they were interested in the Baltimore National Pike [P]roperty, their Rolling Road lease ran through December 2017 and they could not afford to pay rent at two locations at the same time. Not having to pay two rents was of great importance to Dr. Gray.

> Mr. Kalarestaghi "offered to have the Respondent review the Rolling Road lease to

determine whether the lease could be terminated before December 31, 2017[,] without liability." Catonsville Eye thereafter provided Respondent a copy of its Rolling Road lease and amendment for review. Dr. Gray hoped to break the lease, suggesting to Respondent that "Catonsville Eye could [] let the landlord keep its security deposit and then walk away from the lease."

Respondent and Dr. Gray continued their conversations and negotiations over email. Respondent and Dr. Gray exchanged five emails on December 6, 2016, "confirming that a discussion, or some discussions, took place . . . about leasing a space at the Baltimore National Pike [P]roperty, and confirming the in-person meeting[.]" The first email from Respondent to Dr. Gray, provided:

> Hello Erick!

> It was great to meet you today. We tried to get into the terms you mentioned during our meeting. Here is what we are proposing:

-4 months of security deposit in lieu of personal guarantee subject to review of tenant's financials
-5 year lease with two 5 year options to renew
-4% annual increases
-$4,250/month NNN
-Tenant Space B as marked on the attached floor-plan.
-Lease and rental commencement date-February 1
-Signage: Tenant sign on storefront above space, one sign on the side of the building, and space on pylon.
-Brokers: none

Our practice is to have a $1,000 non-refundable deposit once we reach an agreement on terms. That deposit gets applied toward the security deposit. Once we have that, we prepare a lease.

Please let me know if you have any questions!
Ali

The fifth and final email exchanged on December 6, from Dr. Gray to Respondent, read as follows:

When do you truly expect to get your U and O[?] My lead time on cabinetry is 4 months[.] Assuming I had my attorney review the lease. And we both acted quickly. Realistically a final lease would be signed mid January. Architecturally plans will take some time even if I absorbed the risk of expense based on good faith . . . I too do believe your location represents a much better location. I appreciate the quality of appearance and the small business retail compassion. Obviously and fairly I'm looking for rent commencement within 15 days of opening, understanding I'm giving by paying architect fees to expedite my opening. I will make a business decision by Monday at the latest assuming your agreeable to the timing. Thanks Erick[.]

On December 17, 2016, Respondent emailed Drs. Fine and Gray about the Rolling Road lease and amendment:

Hello Gentlemen!

I have read over the two attached documents (the lease dated February 28, 2012 and First Amendment dated September 21, 2012). From my

5

understanding, the lease term started March 1, 2012 and went for 5 years and 6 months. Although the amendment specifies what the rent will be from January 1, 2017 to December 31, 2017, I did not see anything that extended the term.

Therefore, it would be our position (*this is legal advice, it is subject to attorney-client privilege, I cannot even share this review with my father, although you can*) that you are obligated to stay at the Rolling [R]oad location through August 31, 2017. Although the amendment is specifying what your rent would be after that date, I do not see an agreement or provision anywhere that extends the original term from August 31, 2017 to December 31, 2017.

According to Section 21.01 of the lease, it is my understanding that you have placed a security deposit of $9,520.00 with the Landlord. If the base monthly rent in 2017 will be $5,518.14, the security deposit would cover less than two months of rent (most of July and all of August of 2017).

The problem with your idea however (of applying your security deposit to the last two months) is that doing so without an agreement in place (an agreement with your current landlord) would put you in violation of the lease terms. The best way to address this would be for us to send a letter to the Landlord putting them on the defensive and offering a compromise or settlement (namely, ideally, an early termination, and an agreement to apply the security deposit to the remaining rent).

In my very experienced legal opinion, the Landlord has ZERO basis for claiming that your lease ends December 31, 2017. Unless there is a document that I have not been provided, your lease ends August 31, 2017.

Please let me know if you have any questions.
Thank you both!

(Emphasis added). By email dated December 18, Dr. Fine asked Respondent whether Respondent could get Catonsville Eye "out of [their] lease, perhaps June or [J]uly, so we can move into your building or make some kind of concession to ease the pain of double rent[.]" On December 19, Respondent replied:

Hello Gentlemen!

To answer your question, *I do believe that we could negotiate a settlement with the landlord to hand over the property before the end of your term, hopefully June or July as you mentioned*.

But to protect you and show our willingness to work with you, here is our proposal:

1-$4,250/mo net rent
2-February 1st start date
3-Four Months Free (February, March, April, and May).  Rent starts June 1.
4-Four months security deposit as discussed
5-*Up to $5,000 in free legal services through my office to negotiate a settlement with the landlord, or defend a suit by the Rolling Road landlord.*
6-Any period where you have an out of pocket rental obligation at Rolling Road, you will receive a 20% reduced rate at the new location.

Please let me know if you have any questions!

(Emphasis added).  Dr. Gray responded the next day:

[C]learly our mutual goal is to have only 1 landlord.  I agree with your legal position that the later dated lease ends [A]ugust of 2017.  I believe that 1 month security deposit was applied as separate from the 2 months deposit paid with signing of the second lease[,] however [I] may be mistaken. [W]hile sitting at [P]anera[] [I] believe 4 months security was reduced to 3! *My partner Norman and I will sign and hand you the $1000 deposit based not only on your updated and modified proposal[,] but included in is your success in negotiating our way out of our current lease*.  I know that you know that in order for us to open in time we must finalize our deal quickly. I am absolutely appreciative of your efforts in getting this business deal done[.]  And we look forward to a long term relationship.  Thank you for your personal desire to have us as a tenant in your beautifully crafted building.

(Emphasis added).   On December 20, Respondent emailed Drs. Gray and Fine the following:

Understood.  Three months security deposit is correct.  I believe you and my father were talking about that as Dr. Fine and I were talking about something else.  I believe getting you out of your lease should be do-able.  My father is willing to waive rent as long as you have an out of pocket rental obligation, *assuming you give me free rein and your full cooperation in using every*

7

*possible argument to disturb and disrupt the landlord (from a legal standpoint) in an effort to motivating him to release you from your lease.* Now, with that, if we get that Landlord to release you from the lease as of April 30th for example, rent would start for the new space as of May 1, 2017. I think that is fair and hope you agree. We are rolling the dice and betting on the fact that we can get a settlement negotiated with the landlord. Obviously, we do not want and cannot have 7 months of free rent. And on that note, the five year term would start as of the first month that rent is paid.

$1,000 non-refundable deposit gets applied toward the three month security deposit and I will have a lease to you within 36 hours of that for you and any other parties to review. *Obviously, I have a conflict of interest in reviewing the new lease for you!*

You are welcome to leave a check at the Catonsville location and we will have one of us pick it up, or we can meet to do so. Please let me know if you have any questions.

Thank you both!
Ali

(Emphasis added). Later that evening, Dr. Fine emailed Respondent the following questions:

Ali, a few questions:
[W]hat is the yearly rental increase?[]
[C]ommon area maintenance?[]
[R]eal estate taxes?
How much time do you think it will take to negotiate our getting out of the lease?
I assume this will all be covered in the lease agreement.

On December 21, Dr. Fine texted Respondent to meet "for a brief meeting to wrap [this] up." The same morning, Dr. Gray emailed Respondent to "define disturb and disrupt. [A]nd if you are unable to break our lease what then?" Respondent replied:

Good Morning Gentlemen-

8

Dr. Fine texted mentioning a meeting this afternoon. I think that is a good idea. We are available anytime after 2pm. Answers to the questions either of you have mentioned thus far:

1) Define disturb and disrupt- I have to look into it further, but I believe that we may have grounds to argue that your landlord has not lived up to their lease obligations. By disturb and disrupt, I mean that I want to put the landlord in a position that the issues raised by Peepers (through their attorney) become so taxing to respond to that is simply easier and wiser financially and from a business standpoint to simply allow Peepers to leave.

2) What if Ali is unable to break the Rolling Road Lease? If Peepers has cooperated fully (for example, agree to proceed with filing preliminary litigation if needed), and I am still unable to negotiate a settlement with the landlord, we will provide free rent for your new space during the time that you have out of pocket rent. I hope that shows you that not only are we doing all we can (including a nearly blank check for free rent, but also free legal services), but also it should be a reflection of my confidence in our ability to negotiate a resolution with the landlord. We are partners in that side of the deal as well and if we succeed, we succeed together. If we fail, we fail together. We are putting substantial skin in the game.

Again, I have mentioned "out of pocket" rent a few times. Allow me to be very clear so we don't have any coded secrecy. Your lease goes through the end of August. You have 2-3 months of security deposit on file with the landlord. Dr. Gray has always calculated his financial obligation to the current landlord by measuring the end of the lease term (previously believed to be 12/31/17, now agreed to be 8/31/17) and then deducted the security deposit. As I have mentioned before, it is not my legal advice to apply your security deposit unilaterally (without an agreement in place) to the last few months rent because you would be in violation of the lease. However, for purposes of our discussion and calculations, we are applying your existing security deposit held by your current landlord, to the end of your lease. This would have been easier to explain in person, hopefully it makes sense here in written form.

* * *

6) How much time do you think it will take to negotiate our getting out of the lease? I would want to move very quickly. I cannot control the Rolling Road landlord, but my estimate and goal would be to have a settlement in place with them in February.

9

I think meeting this afternoon would be a good idea in order to clarify any of these items, etc. I just received Dr. Fine's email confirming 2pm at Panera in Catonsville. I look forward to it!

-Ali

The hearing judge determined that, at this juncture, "Dr. Gray understood there were issues between Catonsville Eye and their existing landlord. Respondent understood that he was offering legal advice and legal representation to Catonsville Eye to resolve those issues. Both parties understood that Respondent would be the attorney handling the negotiations." "On December 23, 2016, Dr. Fine, on behalf of Catonsville Eye, wrote the Respondent's law office a check for $1,000.00 for reading the [Rolling Road] lease, an amount that MAH Mountain later credited towards Catonsville Eye's security deposit for the 6567 Baltimore National Pike [P]roperty."

On January 10, 2017, Respondent emailed Drs. Fine and Gray a draft lease agreement for the Baltimore National Pike Property:

Hello Gentlemen!

You are wonderful for being so patient. Please do not let this massive delay be an indicator of our interest or eagerness in moving forward. The delay was solely my fault. My father was out of the country and we had a few inspectors drag us through the ringer this week. (not regarding quality of construction, regarding annoyances like the path of the sewer line).

I am attaching the draft of the lease. **As I mentioned, it would be a conflict of interest for me to provide a legal opinion regarding this lease, however I have a provision in the lease confirming that my office will provide up to $5,000 in legal services to terminate your existing lease.** As I mentioned before, that is a very high cap to provide reassurance. I anticipate it will take far less time.

Thank you again for your patience. **Please forward this to your attorney and welcome them to reach out with any questions, proposed changes, etc.**

-Ali

The hearing judge found "no indication as to whether or not Dr. Gray had his attorney review the lease."

The January 10, 2017[,] draft ("January 10 Draft") of the five-year lease started on February 1, 2017, with a 3% yearly increase. Under "Rent Commencement Date," the lease provided:

The Landlord, at Landlord's expense, will engage the services of Law Offices of Ali K., LLC (within this paragraph only, referred to as "Attorney") to represent the Tenant with respect to the termination of Tenant's existing lease on Rolling Road. Landlord will pay up to $5,000.00 in legal fees towards Tenant's termination of their existing lease at Rolling Road. If Tenant has cooperated fully with Attorney (for example, agree to proceed with filing preliminary litigation if needed), and Attorney is still unable to negotiate a settlement with the Tenant's landlord at Rolling Road, Landlord will provide free rent for Tenant's Premises during the time that Tenant has out of pocket rent. The Parties agree that out of pocket rent refers to net rent owed to prior landlord and Tenant's security deposit with their Rolling Road landlord (understood to be equal to 2-3 months of rent) will be applied toward the net rent figure.

Between February and March of 2017, Drs. Fine and Gray and Respondent emailed about the floor plans and architectural drawings for the proposed Catonsville location. On March 24, 2017, Respondent emailed Dr. Gray the revised lease agreement (the "March 24 Lease"). The March 24 Lease commenced on April 1, 2017, for a period of five years, with a three percent yearly rent increase. "The March 24 lease had the same 'Rent Commencement Date' clause as the January 10 [D]raft, except that the Respondent added: 'In no event will the Rent Commencement Date be later than August 1, 2017.'" Dr. Gray

11

testified that he was not prepared to sign the March 24 Lease because "[w]e hadn't negotiated a lease. I didn't retain or have my lawyer review it to respond to it."

According to the hearing judge, Respondent's and Dr. Gray's testimony differed as to the events that occurred on or around April 3 and 4, 2017. "Respondent testified that on April 3, 2017[,] at 4:26 p.m., he received a text from his father advising of a meeting he just had with Dr. Gray." He explained:

> The doctor was here he said if we have the paper lease ready by tomorrow at 12 he be here and sign it the way it is and give us the check only thing in there we have to add that we will put a bathroom before he opens and he will pay us $5[,]000.00.

Respondent continued, "explaining the circumstances of the texts exchanged with his father[:]"

> As I recall, I was in my office. My father called and said Dr. Gray and I are here. We are signing this lease and we just signed this lease, but now we see that this doesn't have the language about the bathroom in it. And maybe one or two other things that they were concerned with . . . . So my father said, yeah, make those changes, I will come by, grab it and will bring it back here and Dr. Gray will sign it. I'm paraphrasing. I don't remember exactly what was said. That is the overall message that I believe was exchanged.
>
> So on April 4th, I kind of come up for air, so to speak, and I texted my father at 1:02 and said, I just finished work. What happened with the doctor, knowing that he had been meeting with him at noon, according to the last message that I had on the topic. And at 1:03 my father said, "I'm waiting for him." At 1:04 I said, "should I print this or what?" I guess meaning a lease agreement. . . . At 1:05 he said, "yes, just add in there we put bathroom after OP and doctor will pay five thousand for that." At 1:05 I said, "all right." He at 1:18 said, "he is here. He signed. His copy you send him." At 1:21 I said call me when he is gone." 1:23 he responded "Okay[.]" 1:27 I said, "lease starts May 1st? Any free rent?" and that was the last text that we had until April 7th.
>
> That is how I recall it. I think that they were meeting and I think that they signed a lease and then I think that they were discussing and said, hey, we

12

got the language about the bathroom. This is all conjecture. I wasn't there. This is how I received it as I sat in my office because I saw a text that said he was here; he signed. Because the text messages, as they are in isolation, don't tell the whole story.

So I believe I received a phone call and I believe that the nature of that call was, hey, we just signed the lease but we see that the bathroom is not in here and whatever; we need to make some changes. So when I started to make changes, I saw that there are some other things that generally we update. So by March 24th to April 4th we were now into a new month. So I wanted to make sure that any of the dates reflected their agreement, et cetera.

So my point of contact was just my father and he was the one that was speaking with Dr. Gray. I had no communications with Dr. Gray on that date or, you know, in the days leading up to it, certainly not about lease terms. And I believe, as I recall it, my father came to my office. I think he made the call. He said, yeah, we need to make these changes. I said okay, I will start making them. And then as I'm doing it, I had another question or two. I sent him a text message. Never received an answer because as I recall it, at that point he is driving to my office, that half mile or so. Dr. Gray was not with him. He comes, he picks it up and he takes it back and they execute it.

Mr. Kalarestaghi also advised Respondent that the free rent and up to $5,000 in free legal services were "no longer part of the deal." Therefore, "[t]he Respondent revised the March 24 [L]ease agreement as instructed by Mr. Kalarestaghi."

On the other hand, Dr. Gray testified that, "[b]etween March 24 and April 4, 2017, . . . Mr. Kalarestaghi called him 'multiple times' and spoke to him 'frequently,' telling Dr. Gray that the bank was exerting 'enormous pressure' on him to obtain money." Specifically, per Dr. Gray's testimony, the hearing judge recognized that:

Mr. Kalarestaghi was "frantic," and "pled" with Dr. Gray to bring a check for a lease deposit. Dr. Gray considered Mr. Kalarestaghi his friend, so he agreed. He wrote a check for $21,500.00, comprising four months' security deposit and first month's rent, drove to Mr. Kalarestaghi's office, and handed him the check. Mr. Kalarestaghi informed Dr. Gray that he needed Dr. Gray to sign the lease agreement. Dr. Gray told Mr. Kalarestaghi that he was not prepared to sign the lease agreement and did not have a copy of the lease

13

with him. Mr. Kalarestaghi appealed to their friendship and promised Dr. Gray that he would make any requested changes. In reliance on Mr. Kalarestaghi['s] assertions, the Respondent's repeated assurances that MAH Mountain would waive or reduce rent during the time that Catonsville Eye owed rent to Klein Enterprise, and the Respondent's legal advice that the Rolling Road lease, by its terms, ended on August 31, 2017, Dr. Gray agreed to sign the lease agreement.

Dr. Gray signed the March 24 Lease on April 4, which commenced on April 1, 2017 (the "April 4 Lease"). After the April 4 Lease was signed, Dr. Gray and Mr. Kalarestaghi noticed the lease did not include "an agreed-upon provision providing for the addition of a bathroom to the premises" and required "a rent commencement date of April 1, 2017." As a result, Mr. Kalarestaghi asked Respondent to update the lease.

The hearing judge noticed that "[t]he April 4, 2017 [L]ease . . . differed from the March 24 [L]ease in three significant ways[:]" (1) Respondent removed the provision providing for free rent and $5,000 in free legal services from the Rent Commencement Date paragraph;[4] (2) "Respondent changed the rent commencement date from April 1 to May 1, 2017[;]" and (3) "the Respondent added a 'Restroom' clause giving Catonsville Eye the option to request that MAH Mountain build a bathroom in the unit in exchange for $5,000.00."

The hearing judge also noted discrepancies in Respondent's and Dr. Gray's testimony regarding the lease signing. Respondent initially claimed he was not present at

---

[4] The hearing judge, however, did not find this exclusion to be "dispositive of the issue of whether there was an attorney/client relationship between Catonsville Eye, and Dr. Gray and Dr. Fine." According to the hearing judge, deletion of this clause "did not terminate or negate the attorney/client relationship."

14

the lease signing, but later testified he was present and merely "was mixing different experiences." Dr. Gray, on the other hand, testified that Respondent was present for the lease signing, and that, "after the Respondent 'started to turn the pages' of the lease agreement, he watched as Mr. Kalarestaghi 'grabbed ahold' of the lease, 'flipped it to the signature pages,' and folded it vertically to expose the signature lines."[5] Upon consideration of the testimony, communications, and lease drafts, the hearing judge found Dr. Gray's testimony to be "more credible." Ultimately, the hearing judge concluded that "an attorney/client relationship existed between the Respondent and Catonsville Eye from December 2016 through April 2017[.]"

On June 5, 2017, MAH Mountain obtained a use and occupancy permit for the Baltimore National Pike Property. Thereafter, "Drs. Fine and Gray began . . . designing and building out the infrastructure for an optometry practice and [eventually] moved Catonsville Eye from Rolling Road to the Baltimore National Pike [P]roperty[.]"

"In August 2017, Dr. Gray received an invoice from MAH Mountain seeking rent payments for May through August 2017." Dr. Gray initially thought the invoice was a mistake and contacted Mr. Kalarestaghi to clarify. Mr. Kalarestaghi's response was "if you don't owe it, don't worry about it." "After some discussion between Dr. Gray and Mr. Kalarestaghi, Dr. Gray believed the two verbally agreed that Catonsville Eye would start paying rent in November 2017." On September 24, 2017, Dr. Gray emailed Respondent

---

[5] The hearing judge also questioned Dr. Gray's supposed "coerc[ion] into signing the lease without being able to read it[]" because Dr. Gray "is an experienced businessman and has signed numerous leases."

15

that his "[a]ttorney is Steve Fedder I will send you his contact info. Any questions will now be a legal matter." Based on Dr. Gray's and Mr. Kalarestaghi's discussion, "Catonsville Eye made its first rent payment to MAH Mountain in November 2017." Mr. Fedder advised Dr. Gray to include a restrictive endorsement with Catonsville Eye's December rent check, "requiring, as a condition of tender, that MAH Mountain modify the lease agreement to reflect a rent commencement date of November 1, 2017." Dr. Gray testified that MAH Mountain did not agree to the restrictive endorsement.

## Procedural History

On December 6, 2017, MAH Mountain, represented by Respondent, sued Catonsville Eye in the District Court of Maryland for Baltimore County, "seeking rent for the period July 1 through December 31, 2017[,] totaling $28,588.08 and late charges in the amount of $1,429.40." "On December 19, 2017, . . . Catonsville Eye . . . moved to disqualify the Respondent as counsel for MAH Mountain, alleging a conflict of interest due to his prior representation of Catonsville Eye." Respondent opposed the motion, claiming that "whatever prior representation may have occurred, it bears no relationship to this matter." The District Court granted Catonsville Eye's motion, recognizing the potential conflict of interest. The court postponed trial to January 2018 "to allow [MAH Mountain] to obtain substitute counsel[.]"

Trial commenced on January 9, 2018. During trial, "Catonsville Eye argued that the court should not enforce the terms of the lease agreement because there was fraud in its inducement." The court held that it "lacked jurisdiction to consider the fraud claim and,

16

based on the [April 4 Lease], entered judgment in the amount of $34,782.16 in favor of MAH Mountain[.]" Catonsville Eye appealed to the Circuit Court for Baltimore County.

On January 16, 2018, Catonsville Eye sued MAH Mountain in circuit court, alleging fraud and legal malpractice against Respondent. Catonsville Eye sought a declaratory judgment affirming that "the Rent Commencement Date of the [April 2017 Lease] . . . be November 1, 2017[.]" The circuit court consolidated the cases on June 14, 2018.

The circuit court conducted a two-day trial on August 14 and 15, 2019. On September 20, the circuit court vacated the District Court's judgment, granting Catonsville Eye's request for declaratory relief. The circuit court ordered the April 4 Lease to "reflect a rent commencement date of August 1, 2017, and that rent payments shall commence as of November 1, 2017[.]" The court, however, dismissed the legal malpractice claim. On November 18, 2019, MAH Mountain timely appealed to the Appellate Court of Maryland.[6]

On January 29, 2021, the Appellate Court of Maryland, in an unreported opinion, held that the circuit court "erred in reforming the lease when issuing a declaratory judgment[;]" however, the circuit court properly held that Respondent "did not commit legal malpractice chiefly because the proof was inadequate." The intermediate court vacated and remanded to the circuit court to "reassess the proof presented **only** on the fraud count[.]"

---

[6] During the November 8, 2022, general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Special Appeals of Maryland to the Appellate Court of Maryland. The name change took effect on December 14, 2022.

17

On November 12, 2021, the circuit court, upon remand, concluded that Catonsville Eye "proved all five elements of fraud[,]" and that it "repudiated the Lease at issue." The court ultimately awarded judgment for Catonsville Eye in the amount of $18,000, "representing the security deposit that was paid."

During the litigation, Catonsville Eye filed a complaint against Respondent with Petitioner. On December 6, 2021, Petitioner filed the instant action with this Court. This Court referred the matter to the hearing judge to conduct an evidentiary hearing and provide findings of fact and conclusions of law.

## HEARING JUDGE'S CONCLUSIONS OF LAW

The hearing judge found, by clear and convincing evidence, that Respondent violated MARPC 19-301.4(a)(1) and (b), 19-301.7, 19-301.8(a), 19-301.9(a), 19-301.16(a)(1), and 19-308.4(a), (c) and (d).

Petitioner filed no exceptions. Respondent filed numerous exceptions, which we address in turn.

## STANDARD OF REVIEW

"In attorney discipline proceedings, 'this Court has original and complete jurisdiction and conducts an independent review of the record.'" *Att'y Grievance Comm'n v. O'Neill*, 477 Md. 632, 658, 271 A.3d 792, 807 (2022) (quoting *Att'y Grievance Comm'n v. Whitehead*, 405 Md. 240, 253, 950 A.2d 798, 806 (2008)). We generally accept the hearing judge's findings of fact unless they are clearly erroneous. *Id.*, 271 A.3d at 807 (citation omitted). Since Respondent filed exceptions, Maryland Rule 19-740(b)(2)(B) provides:

18

[This Court] shall determine whether the findings of fact have been proved by the requisite standard of proof set out in Rule 19-727(c). Th[is] Court may confine its review to the findings of fact challenged by the exceptions. Th[is] Court shall give due regard to the opportunity of the hearing judge to assess the credibility of witnesses.

"This Court shall not disturb the hearing judge's findings where there is any competent evidence to support the finding of fact." *O'Neill*, 477 Md. at 658, 271 A.3d at 808 (internal quotations and citations omitted). "We assess the hearing judge's legal conclusions under a *de novo* standard of review." *Id.*, 271 A.3d at 808 (citations omitted). "If the hearing judge's factual findings are not clearly erroneous and the conclusions drawn from them are supported by the facts found, exceptions to conclusions of law will be overruled." *Att'y Grievance Comm'n v. Tanko*, 408 Md. 404, 419, 969 A.2d 1010, 1019 (2009). "We have 'the ultimate authority to decide whether a lawyer has violated the professional rules.'" *O'Neill*, 477 Md. at 659, 271 A.3d at 808 (quoting *Att'y Grievance Comm'n v. Harrington*, 367 Md. 36, 49, 785 A.2d 1260, 1267 (2001)) (internal citations and quotation marks omitted).

## DISCUSSION

### Exceptions

Maryland Rule 19-728(b) provides, in pertinent part, that "each party may file (1) exceptions to the findings and conclusions of the hearing judge, (2) recommendations concerning the appropriate disposition under Rule 19-740 (c), and (3) a statement of costs to which the party may be entitled under Rule 19-709." We first address Respondent's exceptions to the findings of fact.

19

**Exceptions to Findings of Fact**

*Exception One*

First, Respondent excepts to the hearing judge's finding that Catonsville Eye executed an addendum extending its lease to December 31, 2017. Respondent maintains that "[n]o court has ever found that the lease addendum, by its terms, extended the lease to December 31, 2017." Respondent claims that while "[t]he parties to it may have treated the addendum as having extended the lease," his review revealed that the "only logical inference" for the expiration of the lease was sometime "in the third quarter of 2017, like August/September 2017."

We disagree. The hearing judge's finding was supported by the exhibits submitted and testimony. *Att'y Grievance Comm'n v. McDonald*, 437 Md. 1, 16, 85 A.3d 117, 125 (2014) (citation omitted); *see also* Md. Rule 19-740(b)(2)(B) ("The Court shall give due regard to the opportunity of the hearing judge to assess the credibility of witnesses."). In Catonsville Eye's complaint, they alleged that Respondent committed malpractice by advising Catonsville Eye that their Rolling Road landlord had "ZERO basis" for claiming that the lease ended in December 2017. To the contrary, Catonsville Eye alleged that "[n]ot only did the landlord have a basis for a claim that the lease term was extending to December 31, 2017, but more than likely would have prevailed in such a lawsuit." At the April 27 hearing, Dr. Gray testified that, by the terms of the Rolling Road lease and amendment, the lease expired in "December of 2017." Therefore, we conclude that the hearing judge's finding was supported by clear and convincing evidence.

20

## *Exception Two*

Second, Respondent excepts to the hearing judge's finding that Drs. Gray and Fine were unaware of Respondent's interest in MAH Mountain; rather, Respondent maintains that the parties' communications illustrate an "express acknowledgement of Respondent's interest in MAH Mountain." Respondent examples several email exchanges between the parties, highlighting language (*e.g.*, "[o]ur practice[,]" "we[,]" and "your building") that Respondent believes reflects "actual knowledge" on behalf of Catonsville Eye of Respondent's interest in MAH Mountain. Respondent also testified that he previously discussed "MAH Mountain and . . . who was involved[]" with Dr. Gray. The hearing judge concluded that Respondent failed to advise Catonsville Eye that he had an ownership interest in MAH Mountain at any time prior to the execution to the April 4 Lease. There is no evidence in the record to support Respondent's assertion that Drs. Gray and Fine expressly knew of Respondent's interest in MAH Mountain. In fact, Dr. Gray testified to the contrary:

> Q. And were you aware at the time of the meeting that Ali Kalarestaghi was an attorney?
>
> A. I think he introduced himself as his father's attorney.
>
> Q. Okay. And were you aware that Ali Kalarestaghi represented MAH Mountain or did you think it was his father personally that he represented?
>
> A. I thought it was his father who he represented.

The evidence advanced by Respondent does not suggest, and we do not accept, that Drs. Gray and Fine had actual knowledge of Respondent's interest in MAH Mountain. We, therefore, overrule this exception.

21

Third, Respondent excepts to the finding that Catonsville Eye provided Respondent a copy of their existing lease after the first meeting "to see if they could break their lease." Rather, Respondent argues that Catonsville Eye advised him before their initial meeting that Catonsville Eye's existing lease expired in September. At the April 27 hearing, Dr. Gray testified to the events at the first Panera Bread meeting:

> A. Well, [Dr. Fine and I] were adamant about the fact that we were not in a financial condition to pay rent at two locations at the same time. And so that we could not afford to enter into it under those terms. And that was the primary event.
>
> Q. Did you advise the Kalarestaghis of the day that you believe that your earlier lease –
>
> A. We told them we were obligated through December of 2017.
>
> Q. Okay. And do you recall what their reaction was to that?
>
> A. They said they would look into that, that they would look into that date at that time. They offered us -- again, if I remember right, a reduction in rent if there was an overlap. They were looking for ways to make concessions.
>
> * * *
>
> Q. Okay. And why did [Respondent] review these documents?
>
> A. It was said that his father was offering up [Respondent's] Legal Services for up to five thousand dollars to evaluate the Rolling Road lease for the purpose of seeing if it had an early termination.
>
> Q. Okay. When you say it was said, who said that to you, if you recall?
>
> A. I believe [Respondent] said it.
>
> Q. Do you recall when [Respondent] said that?

A. Within a day or two of that meeting, if not -- I think within a day or two of that meeting.

The first Panera Bread meeting occurred on December 6, 2016. Respondent emailed Drs. Fine and Gray his "legal advice" regarding Catonsville Eye's current lease and addendum on December 17. The hearing judge evaluated the evidence and weighed Dr. Gray's testimony. "The hearing judge is in the best position to make these types of credibility evaluations and we cannot find that the hearing judge was clearly erroneous." *Att'y Grievance Comm'n v. Maldonado*, 463 Md. 11, 36, 203 A.3d 841, 855 (2019) (citations omitted). We, therefore, will not overrule the hearing judge's finding.

### *Exception Four*

Respondent next excepts to the finding that he offered to review the Rolling Road Lease and "determine whether Catonsville Eye could terminate the lease" in exchange for $5,000. Respondent asserts that he never offered his legal services in exchange for money, and that the $5,000 "had nothing to do with the review of the Rolling Road lease." The record demonstrates otherwise. On December 19, 2016, Respondent emailed Drs. Gray and Fine, offering, amongst other things, "[u]p to $5,000 in free legal services through my office to negotiate a settlement with the landlord, or defend a suit by the Rolling Road landlord." On January 10, 2017, Respondent reconfirmed that "I have a provision in the lease confirming that my office will provide up to $5,000 in legal services to terminate your existing lease." The Rent Commencement Date clause in the January 10 Draft also included this exchange:

> The Landlord, at Landlord's expense, will engage the services of Law Offices of Ali K., LLC . . . to represent the Tenant with respect to the

23

termination of Tenant's existing lease on Rolling Road. *Landlord will pay up to $5,000.00 in legal fees towards Tenant's termination of their existing lease at Rolling Road.*

(Emphasis added). Dr. Gray further testified that, after the first Panera Bread meeting, Respondent's father "offer[ed] up [Respondent's] Legal Services for up to five thousand dollars to evaluate the Rolling Road lease for the purpose of seeing if it had an early termination." Dr. Gray understood this to mean that Respondent "was representing [Catonsville Eye] with regard to [their] Rolling Road location and lease." The hearing judge's finding regarding Respondent's exchange of services for $5,000 was well supported by the record. Accordingly, we overrule the exception.

### *Exception Five*

Fifth, Respondent excepts to the hearing judge's finding that "Respondent understood that he was offering legal advice and legal representation to Catonsville Eye to resolve those issues. Both parties understood that Respondent would be the attorney handling the negotiations." Respondent maintains there is "no testimony or documentary evidence supporting such findings."

We disagree. The Rent Commencement Date clause in the January 10 Draft stated that "[t]he Landlord . . . will engage the services of [Respondent] . . . to *represent* the Tenant with respect to the termination of Tenant's existing lease on Rolling Road." (Emphasis added). The March 24 Lease similarly included the provision that Respondent "would provide *representation* for Catonsville Eye on the early termination issue[.]" (Emphasis added). As the hearing judge noted, the emails between Respondent and Catonsville Eye, wherein the parties discussed strategy, support the conclusion that

24

Respondent understood he represented Catonsville Eye in the Rolling Road lease termination negotiations. This finding is supported by material evidence in the record. Thus, Respondent's exception is overruled.

### *Exception Six*

Sixth, Respondent excepts to the finding that Dr. Gray paid Respondent $1,000 to review the Rolling Road lease. Respondent claims the $1,000 was for "MAH [Mountain] to prepare a proposed lease." At the April 27 hearing, Dr. Gray testified that he "had paid a thousand dollars up front *for reading the lease*. I had four months security deposit and first month lease *less the thousand dollars*." (Emphasis added). Respondent provided Catonsville Eye with his "legal advice" regarding the Rolling Road lease on December 17, 2016. Less than a week later, Catonsville Eye provided Respondent—not MAH Mountain—with a check for $1,000. Respondent provided Catonsville Eye the first draft lease on January 10, 2017. There is material evidence to support a finding that Catonsville Eye wrote Respondent a $1,000 check to review the Rolling Road lease, which was later credited towards their security deposit for the Baltimore National Pike Property lease. We, therefore, overrule this exception.

### *Exception Seven*

Respondent further excepts to the finding that Catonsville Eye signed the Baltimore National Pike Property lease because: (1) Respondent made "repeated assurances" that MAH Mountain would "waive or reduce rent during the time that Catonsville Eye owed rent to" the Rolling Road landlord and (2) Respondent advised that the Rolling Road lease ended in August or September 2017. Respondent claims he "made no such assurances."

25

Instead, Respondent notes that Catonsville Eye "did not execute and agree" to those "previous offers[,]" but "agreed to lease for a completely different unit with . . . significantly different material terms." As to the latter, Respondent maintains he told Catonsville Eye "an early termination was not certain and Dr. Gray . . . understood . . . it required negotiations." Respondent uses various email communications to illustrate his contention, such as the December 19 email, wherein Respondent stated, "I do believe that we could negotiate a settlement with the landlord[,]" and the December 20 email, wherein Respondent stated that "[w]e are rolling the dice and betting on the fact that we can get a settlement negotiated with the landlord."

The hearing judge reviewed the evidence and testimony and found that Catonsville Eye signed the Baltimore National Pike Property lease in reliance on Respondent's assertion. Respondent emailed Catonsville Eye on December 17 that its "Landlord has ZERO basis for claiming that [their] lease ends December 31, 2017." Dr. Gray relied upon Respondent's legal opinion, testifying that he understood that to mean Respondent was "a hundred percent sure that we didn't have an extension past August." On December 20, Respondent emailed Catonsville Eye that his father was "willing to waive rent as long as you have an out of pocket rental obligation, assuming you give me free rein and your full cooperation in using every possible argument to disturb and disrupt the landlord . . . to release you from your lease." The testimony and exhibits support the hearing judge's finding. We, therefore, cannot say the finding was clearly erroneous.

Eighth, Respondent excepts to the hearing judge's finding that the March 24 Lease "did not contain an agreed-upon provision providing for the addition of a bathroom to the premises." Respondent argues this finding was "based solely on Respondent's speculation at trial[.]" The hearing judge found Respondent's testimony to be credible on this issue. The record does not contain evidence contradicting Respondent's own testimony. *See Att'y Grievance Comm'n v. Miller*, 467 Md. 176, 197, 223 A.3d 976, 988 (2020). As such, the hearing judge correctly found that the March 24 Lease did not contain the provision providing for the addition of a bathroom. *See Att'y Grievance Comm'n v. Kane*, 465 Md. 667, 706–07, 215 A.3d 242, 265 (2019). We, therefore, overrule this exception.

*Exception Nine*

Respondent next excepts to the hearing judge's finding that the March 24 Lease had a start date of April 1, 2017, and that Respondent updated the lease. Instead, Respondent claims the March 24 Lease had a commencement date "of no later than August 1, 2017[,] based upon conditions of rent abatement[,]" and the April 4 Lease had a rent commencement date of May 1, 2017.

As to the latter, we agree. The April 4 Lease had a commencement date of May 1, 2017. However, we disagree as to the commencement date of the March 24 Lease. While the March 24 Lease contained a contingency based on the Rolling Road lease termination, the lease defines the commencement date as April 1, 2017. Dr. Gray also testified that the commencement date for the March 24 Lease was April 1, 2017. Respondent's own testimony also confirms the hearing judge's findings:

27

Q. I believe you also testified . . . that the previous lease, at least the March 24 version . . . didn't have a rent commencement date of May 1st, 2017, is that correct?

A. I don't remember what the March 24th rent commencement date was.

Q. All right. So let's go to the previous exhibit, Exhibit Number 4 [the March 24 Lease]. And I guess it would be Page 21.

A. Uh-hum.

Q. All right. *That was the commencement date of April 1st, 2017?*

A. *Correct*.

Q. And then turning back to page 49, *the commencement date on [the April 4 Lease] has been changed to May 1st, 2017?*

A. *Yes*, because as of the time of this draft, the commencement date was no longer possible because April 1st had passed three days ago.

(Emphasis added). Based upon the testimony and facts described above, the hearing judge's finding is supported by clear and convincing evidence. Therefore, Respondent's exception is overruled.

### Exception Ten

Tenth, Respondent excepts to the hearing judge's finding that the April 4 Lease differed from the March 24 Lease in three "significant" ways: (1) removal of the Rent Commencement Date clause providing for $5,000 in legal services and potential "free rent" contingent on the Rolling Road lease, (2) the changed commencement date from April 1, 2017, to May 1, 2017, and (3) the addition of a "Restroom" clause providing Catonsville Eye the option to request MAH Mountain build a bathroom in unit for $5,000. Respondent asserts that the April 4 Lease and the March 24 Lease differed in two additional respects:

(4) an entirely "**different space**—the preferable end unit, not the middle unit[]" and (5) "greater options of lease renewal[.]"

The hearing judge noted, per Respondent's December 6, 2016, email, that the parties originally negotiated for the middle unit, also known as "Space B" or "Unit 102[,]" of the Baltimore National Pike Property. The hearing judge also considered the unit's desirability, stating that "[t]he March 24 lease, like the January 10 draft, was for the middle space, a less desirable space[.]" The hearing judge identified that the March 24 Lease and the April 4 Lease "erroneously identif[ied] 'suite 102,' a middle unit, as the unit to be occupied by Catonsville Eye, but at some point during the negotiations it was agreed that Catonsville Eye would occupy the end unit." It is clear that the hearing judge was aware of the unit change in the lease. This Court defers to the hearing judge to determine what constituted a "significant" change in the leases. *Kane*, 465 Md. at 679 n.6, 215 A.3d at 249 n.6 (citation omitted) (providing the hearing judge "significant deference in . . . picking and choosing from the evidence presented and the inferences to be drawn from that evidence"); *Att'y Grievance Comm'n v. Singh*, 464 Md. 645, 662 n.15, 212 A.3d 888, 899 n.15 (2019) (citation omitted). We, therefore, will not overrule the hearing judge's finding that the April 4 Lease "significant[ly]" differed from the March 24 Lease in three ways. Accordingly, we overrule Respondent's exception.

### *Exception Eleven*

Next, Respondent excepts to the finding that there was no indication that Dr. Gray "was willing to pay substantially more rent . . . in exchange for leasing an end space." Respondent argues that Dr. Gray "pa[id] the exact same amount in rent for the end space[]"

29

as he would have for the middle space. We find no merit in Respondent's claim. The hearing judge did not find that the April 4 Lease rent price increased. Dr. Gray testified to this finding:

> Q. And do you recall expressing any preference to the Kalarestaghis about which of those two units, the end unit or the middle unit, you would prefer to occupy?
>
> A. I don't remember if it was at that time, but at some point I said it was agreed to that the end unit had more visibility, but for me, the benefit to the mid-unit was it had a bathroom and as long as I had signage on both walls I was okay with either one.
>
> Q. As you are discussing it in 2016, *would you have been willing to pay substantially more rent to occupy the end unit versus the middle unit?*
>
> A. *No.*

(Emphasis added). We have no reason to regard this finding as clearly erroneous based on our review of the record. We, therefore, overrule Respondent's exception.

### *Exception Twelve*

Twelfth, Respondent excepts to the hearing judge's finding that Dr. Gray was not prepared to sign the April 4 Lease because "there were no negotiations however he was willing to pay MAH Mountain $4,500 out of friendship, without signing anything." Instead, Respondent alleges that "**Dr. Gray intended on April 4 to go and sign a lease and present a check.**" We disagree. While Dr. Gray alleged in his complaint to Petitioner that he "intended on April 4 to go and sign a lease and present a check[,]" he also testified as follows:

> Q. Did you go to [Mehdi's] office that day intending to sign a lease?
>
> A. *No.*

30

Q. Why not?

A. Because it hadn't been reviewed.

Q. Hadn't been reviewed?

A. By an attorney.

Q. Okay. And what changed your mind?

A. [Mehdi] and I had a *friendship* and he was desperate and promised me over and over again he would not cheat me, he would make any changes that needed to be made and that he needed it. He needed it so badly because he was in -- he just needed it. And I was uncomfortable with it. I expressed my discomfort with it. He continued pleading with me to do it. Even when [Respondent] showed up with the leases, I made point of letting -- saying it again, to which [Respondent] responded that I'm willing to make any and all changes my father tells me to make.

\* \* \*

Q. And why was it that with all [your business] experience you signed a lease without having an attorney review it?

A. We were *friends* and I thought him to be honorable.

(Emphasis added). The court recognized the conflicting testimony and questioned "the credibility of Dr. Gray's testimony, that he was coerced into signing the lease without being allowed to read it." The hearing judge noted Dr. Gray's business experience with "numerous leases[]" and that he had an attorney. However, "[a]fter considering all of the testimony and reviewing the emails and leases, the [c]ourt [found] Dr. Gray's testimony . . . to be more credible." In deference to the hearing judge, we determine that this finding was supported by clear and convincing evidence and, therefore, overrule this exception.[7]

---

[7] The dissent asserts that we "relax[] the clear and convincing standard by sustaining

(continued . . .)

31

## *Exception Thirteen*

Respondent further excepts to the finding that an attorney-client relationship existed between Catonsville Eye and Respondent. Respondent relies on three emails to support the conclusion that "Dr. Gray could not have reasonably believed that the Respondent represented Catonsville Eye with regard to the Rolling Road lease." The December 17 and

---

(. . . continued)
the hearing judge's findings so long as there was some testimony from Dr. Gray that could be interpreted as supporting the findings." *Att'y Grievance Comm'n v. Kalarestaghi*, No. 48 Sept. Term, 2021, slip op. at 9 (Gould, J., concurring in part and dissenting in part). "[T]o satisfy this exacting standard," the dissent observes, "the testimony must be capable of being found credible 'when considered in connection with all the facts and circumstances in evidence.'" *Id.* (quoting *Att'y Grievance Comm'n v. Mooney*, 359 Md. 56, 79, 753 A.2d 17, 29 (2000)).

As this Court has stated on countless occasions, "[w]e accept the hearing judge's findings of fact unless they are clearly erroneous, and we defer to the hearing judge's assessment of the witnesses' credibility." *Att'y Grievance Comm'n v. Sperling*, 459 Md. 194, 233, 185 A.3d 76, 98 (2018) (citing *Att'y Grievance Comm'n v. Ugwuonye*, 405 Md. 351, 368, 952 A.2d 226, 236 (2008)). "We do so because '[t]he hearing judge is in the best position to evaluate the credibility of the witnesses and to decide which one to believe and, as we have said, to pick and choose which evidence to rely upon.'" *Johnson*, 472 Md. at 527, 247 A.3d at 789 (quoting *Att'y Grievance Comm'n v. Hodes*, 441 Md. 136, 181, 105 A.3d 533, 560 (2014)). "Indeed, [a]s far as what evidence a hearing judge must rely upon to reach his or her conclusions, we have said that the hearing judge may pick and choose what evidence to believe." *Att'y Grievance Comm'n v. Smith-Scott*, 469 Md. 281, 333, 230 A.3d 30, 60 (2020) (internal quotation marks and citation omitted). "This Court will not disturb the hearing judge's findings where there is any competent evidence to support the finding of fact." *Att'y Grievance Comm'n v. Moawad*, 475 Md. 424, 458, 257 A.3d 611, 631 (2021) (citation omitted); *McDonald*, 437 Md. at 16, 85 A.3d at 125 ("A hearing judge's factual finding is not clearly erroneous [i]f there is any competent material evidence to support [it]." (internal quotation marks and citation omitted)). Again, we find no clear error here or "misplaced deference to the hearing judge." *Kalarestaghi*, slip op. at 10 (Gould, J., concurring in part and dissenting in part). The hearing judge, after considering the testimony and reviewing the record, found Dr. Gray to be credible. This determination was not "too grave of an inferential step[.]" *Att'y Grievance Comm'n v. Ucheomumu*, 450 Md. 675, 696, 150 A.3d 825, 837 (2016). The hearing judge's credibility determinations are within her discretion; accordingly, we overrule Respondent's exception.

December 21 emails, Respondent claims, reveal that he merely "offered his opinion and proposal as to how Catonsville Eye might negotiate with its landlord an early exit from its current space[.]" Despite knowing that negotiations with their Rolling Road landlord would be necessary, Respondent maintains that Drs. Gray and Fine "did nothing"—they "did not execute agreements with MAH [Mountain] to pursue the effort . . . [nor] retain[ed] Respondent to do so." Respondent further excepts to the finding that he "would have continued to represent [Catonsville Eye] in the future, on that issue, as specified in the Rent Commencement Date clause" as speculative and "contrary" to the language in the April 4 Lease. We disagree. During Dr. Gray's testimony, he indicated several times that he believed Respondent represented them with regard to the Rolling Road lease and would continue to do so throughout lease negotiations. The hearing judge, "[a]fter considering all of the testimony and reviewing the emails and leases," credited Dr. Gray's testimony. Accordingly, we overrule Respondent's exception.

### Exception Fourteen

Respondent also excepts to the hearing judge's finding that his emails reflect that he engaged in numerous "detailed strategy discussions with Drs. Fine and Gray about the methods he would use to achieve an early termination of the Rolling Road Lease." Respondent maintains these emails were not "detailed strategy discussions[;]" rather, they "offered his opinion . . . as to how Catonsville Eye might negotiate . . . an early exit[.]" Respondent is correct that the record contains emails from him to Catonsville Eye, concerning termination of the Rolling Road lease. Nevertheless, the record also supports the hearing judge's description of those emails as "strategy discussions." For example, in

the December 17 email, Respondent states that "[t]he best way to address this *would be* for us to send a letter to the Landlord putting them on the defensive and offering a compromise or settlement[.]"  (Emphasis added).  We, therefore, overrule this exception.

### *Exception Fifteen*

Respondent next excepts to the hearing judge's finding that he never terminated his representation of Catonsville Eye because he "never represented Catonsville Eye." Respondent argues Catonsville Eye did not "manifest an intent that the Respondent provide [them] legal services."  We are unconvinced.  As previously discussed, there was clear and convincing evidence to support the hearing judge's finding that Catonsville Eye reasonably believed that Respondent represented them.  The hearing judge's credibility determinations are within her discretion and, accordingly, we overrule Respondent's exception.  *Hodes*, 441 Md. at 182, 105 A.3d at 560.

### *Exception Sixteen*

Finally, Respondent excepts to the hearing judge's finding that, during the District Court proceeding, the court recognized that the circumstances raised a conflict-of-interest issue, leading the District Court to postpone trial "to allow MAH Mountain to obtain substitute counsel and avoid the possibility of [a conflict] occurring."  Respondent asserts this "incomplete reference . . . was not before the [h]earing [j]udge for its truth or for fact finding purpose[s]" and "should be stricken as exceeding the scope[.]"  Specifically, Respondent argues that Petitioner's Exhibits 11 through 17 were narrowly admitted to support witnesses' testimony and "not for the truth of any of the factual findings[.]" However, Respondent fails to recognize that, in making this finding, the hearing judge

34

relied upon Exhibits 8 through 10—*not* Exhibits 11 through 17—to provide procedural background.  Accordingly, we overrule Respondent's exception.

**Conclusions of Law**

Having concluded that the hearing judge's findings of fact were not clearly erroneous, we now turn to address the hearing judge's sustained violations.  The hearing judge concluded that Respondent violated MARPC 19-301.4(a)(1) and (b), 19-301.7, 19-301.8(a), 19-301.9(a), 19-301.16(a)(1), and 19-308.4(a), (c) and (d).  Respondent excepts to all the hearing judge's conclusions of law.  Based on our independent review of the record, we uphold the hearing judge's legal conclusions, except for the 19-308.4(c) violation.

**MARPC 19-301.4. Communication (1.4)**

MARPC 19-301.4 provides in relevant part:

(a) An attorney shall:

(1) promptly inform the client of any decision or circumstance with respect to which the client's informed consent . . . is required by these Rules;

\* \* \*

(b) An attorney shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

A lawyer violates MARPC 19-301.4 "when the attorney fails to communicate crucial information about the status of the case [to the client]."  *Att'y Grievance Comm'n v. White*, 480 Md. 319, 370, 280 A.3d 722, 751 (2022) (alteration in original) (internal quotation marks and citations omitted).  MARPC 19-301.4(b) "requires an attorney to communicate with a client to the extent reasonably necessary to permit the client to make

35

informed decisions." *Att'y Grievance Comm'n v. Framm*, 449 Md. 620, 650, 144 A.3d 827, 845 (2016) (internal quotations omitted).

The hearing judge concluded that Respondent violated MARPC 19-301.4(a)(1) and (b) by failing to communicate and explain to Catonsville Eye his conflict of interest in concurrently representing Catonsville Eye for the termination of their Rolling Road lease and MAH Mountain for the negotiation of the Baltimore National Pike Property lease. While Respondent advised Drs. Fine and Gray that he could not review the Baltimore National Pike Property lease with them, the hearing judge recognized that Respondent "drafted all versions of the lease." As previously discussed, the hearing judge noted that Respondent failed to inform Catonsville Eye that he had a thirty-percent ownership interest in MAH Mountain prior to the execution of the April 4 Lease. Ultimately, the hearing judge determined that, because Respondent failed to "disclose the conflicts, or potential for conflict, or explain the effects that the conflict could have on his representation, Drs. Fine and Gray could not[:]" (1) consent to Respondent's continued representation of Catonsville Eye or (2) "make informed decisions about whether to allow the Respondent to pursue early termination of their Rolling Road lease on their behalf while they were entering into a new lease agreement with MAH Mountain." Respondent excepts to this conclusion by stating that Petitioner failed to establish the violation by clear and convincing evidence.

Clear and convincing evidence supports the hearing judge's conclusion that Respondent violated MARPC 19-301.4(a)(1) and (b). The hearing judge noted that Respondent did not explain the existence or appearance of a conflict of interest between Catonsville Eye or MAH Mountain. The hearing judge concluded that Respondent's

36

failure to adequately explain the conflict deprived Catonsville Eye of the ability to make informed decisions. *See Framm*, 449 Md. at 649, 144 A.3d at 844. By failing to inform Drs. Gray and Fine of a potential conflict, Respondent violated MARPC 19-301.4(a)(1) and (b). *See Att'y Grievance Comm'n v. Olszewski*, 441 Md. 248, 267, 107 A.3d 1159, 1169 (2015) ("We agree with the hearing judge that Respondent clearly violated [MARPC 19-301.4](a)(1) by failing to explain the potential conflict of interest when he undertook joint representation[.]"). Other than one conclusory sentence, Respondent offers no basis for asserting that this conclusion was not proven by clear and convincing evidence. We, therefore, sustain the hearing judge's conclusion.

### MARPC 19-301.7. Conflict of Interest – General Rule (1.7)

MARPC 19-301.7 provides:

**(a)** Except as provided in section (b) . . . an attorney shall not represent a client if the representation involves a conflict of interest. A conflict of interest exists if:

(1) the representation of one client will be directly adverse to another client; or

(2) there is a significant risk that the representation of one or more clients will be materially limited by the attorney's responsibilities to another client, a former client or a third person or by a personal interest of the attorney.

**(b)** Notwithstanding the existence of a conflict of interest under section (a) . . . an attorney may represent a client if:

(1) the attorney reasonably believes that the attorney will be able to provide competent and diligent representation to each affected client;

(2) the representation is not prohibited by law;

37

(3) the representation does not involve the assertion of a claim by one client against another client represented by the attorney in the same litigation or other proceeding before a tribunal; and

(4) each affected client gives informed consent, confirmed in writing.

The hearing judge determined that Respondent violated MARPC 19-301.7 by concurrently representing Catonsville Eye in the termination of their Rolling Road lease and in the negotiation of the Baltimore National Pike Property lease with MAH Mountain. According to the hearing judge, this representation "created a significant risk that the representation of one client would be materially limited by his responsibilities to another client." In fact, the hearing judge found that Respondent's concurrent representation put the parties "in direct conflict with each other[.]" Respondent, as a partial owner in MAH Mountain, had a "personal interest" in the outcome of the lease negotiations. Therefore, Respondent's "'loyalties were divided'" between MAH Mountain and Catonsville Eye in violation of MARPC 19-301.7(a)(2). As evidenced by Respondent's emails, the hearing judge noted that he was clearly "aware of the potential for a conflict of interest," yet Respondent "failed to obtain Catonsville Eye's informed consent in writing as required by [MARPC 19-301.7](b)."

Respondent excepts to the hearing judge's conclusion, maintaining that he did not "violate conflict of interest rules" because "Catonsville Eye was a prospective client who never formed an attorney-client relationship with Respondent[.]" Respondent further alleges that Petitioner failed to identify: "(1) how Respondent's representation . . . was directly adverse . . . , (2) what was the significant risk," and (3) how the representation of one client was materially limited by his representation to the other. To Respondent, the

38

representation could not be considered "adverse" because Catonsville Eye and MAH Mountain had the same goal—to sign a lease for the Baltimore National Pike Property. For the reasons set forth below, we overrule Respondent's exception.

This Court has previously explained that:

An attorney-client relationship is formed when: (1) a person manifests to a lawyer the person's intent that the lawyer provide legal services for the person; and . . . (b) the lawyer fails to manifest lack of consent to do so, and the lawyer knows or reasonably should know that the person reasonably relies on the lawyer to provide [legal] services.

*Att'y Grievance Comm'n v. Agbaje*, 438 Md. 695, 727, 93 A.3d 262, 280–81 (2014) (citation omitted). In *Hodes*, we further described the "parameters" of the attorney-client relationship:

The facts and circumstances of each particular case are critical in determining whether an attorney-client relationship exists. A key factor that courts look to is whether the purported "client" sought legal advice. Certainly, an attorney-client relationship still can be found even though the attorney renders services or advice that is not strictly legal in character. Moreover, a personal relationship or close friendship with a purported "client" does not preclude a court from finding that an attorney-client relationship exists. Our cases make clear that an explicit agreement or payment arrangement is not a prerequisite to the formation of an attorney-client relationship.

441 Md. at 170, 105 A.3d at 553–54 (internal citations omitted); *see also Framm*, 449 Md. at 655, 144 A.3d at 848 ("We have explained that the formation of an attorney-client relationship 'does not require an explicit agreement,' but rather may arise from the conduct of the parties." (citation omitted)).

There were two components to the attorney-client relationship found by the hearing judge: (1) reviewing the Rolling Road lease and rendering a legal opinion on its termination date; and (2) representing Catonsville Eye in negotiations with the Rolling Road landlord

to achieve an early termination of that lease. The evidence clearly and convincingly establishes the first component. It is less clear whether the evidence clearly and convincingly establishes the second.

On January 10, 2017, Respondent emailed Drs. Fine and Gray the January 10 Draft for the Baltimore National Pike Property:

> I am attaching the draft of the lease. **As I mentioned, it would be a conflict of interest for me to provide a legal opinion regarding this lease, however I have a provision in the lease confirming that my office will provide up to $5,000 in legal services to terminate your existing lease.** As I mentioned before, that is a very high cap to provide reassurance. I anticipate it will take far less time.
>
> Thank you again for your patience. **Please forward this to your attorney and welcome them to reach out with any questions, proposed changes, etc.**

The January 10 Draft provided in part:

> The Landlord, at Landlord's expense, will engage the services of Law Offices of Ali K., LLC (within this paragraph only, referred to as "Attorney") to represent the Tenant with respect to the termination of Tenant's existing lease on Rolling Road. *Landlord will pay up to $5,000.00* [i]n *legal fees towards Tenant's termination of their existing lease at Rolling Road. If Tenant has cooperated fully with Attorney (for example, agree to proceed with filing preliminary litigation if needed), and Attorney is still unable to negotiate a settlement with the Tenant's landlord at Rolling Road, Landlord will provide free rent for Tenant's Premises during the time that Tenant has out of pocket rent.*

(Emphasis added). On January 16, Dr. Gray emailed Respondent that he would "be unavailable for [the] next 2 weeks." On February 6, Dr. Gray advised Respondent that he would "be focusing on Catonsville tomorrow . . . [w]e will absolutely have clarity by the end of tomorrow." The next day, Dr. Gray emailed Respondent that he "[s]poke with Dr[.]

40

Fine who is trying to rationalize the cost of relocating. My suggestion is to meet and discuss our concerns. We are available mid morning this Thursday[, February 9]. Would you like to meet around 1100 at Pan[era]??" Respondent replied that "Thursday, 11am at Panera sounds great. I confirmed that my father is free then as well. We look forward to sitting down with you gentlemen. We'd be happy to discuss anything of concern!" On February 8, Dr. Gray informed Respondent that:

> Dr[.] Fine has voted not to relocate to your site for the valid reason of age. Norman believes he will not benefit quick enough to justify the build out expense. I can't argue his perspective[.] Therefore I can only thank you both for your professionalism and kind manner in our negotiations. If you have any other suggestions we are willing recipients. Thank you both.

Despite this email, Dr. Gray still went to the meeting at Panera as scheduled and negotiations continued. If, at this juncture, Catonsville Eye did not expect for Respondent to take *any* steps to secure an early termination of the Rolling Road lease, then one must ask *why* Dr. Gray still scheduled and attended the February 9 Panera meeting. When questioned about the February 8 email, Dr. Gray testified as follows:

> Q. Did you have any conversations about leasing 6567 with [Mehdi] Kalarestaghi following this e-mail?
>
> A. Yes.
>
> Q. Do you recall -- what do you recall was the substance of that location?
>
> A. Just that if he could think of any other way, that I was still interested.
>
> Q. And when you say any other way, what do you mean by that?
>
> A. If he had any other suggestions. Brainstorm and come up with an alternative suggestion.

41

Q. Okay. And you reference acknowledging terminating your existing Catonsville lease?

A. I'm sorry?

Q. You reference acknowledgement of termination of your Catonsville lease. Do you see that in the e-mail?

A. Yes.

*Q. Was it still your understanding at this point that [Respondent] was representing you in negotiations with your Rolling Road landlord?*

*A. Yes.*

(Emphasis added). Again, when questioned by Respondent's counsel, Dr. Gray testified as follows:

Q. And you didn't consider [Respondent] to be your lawyer in terms of any negotiation on this new lease with MAH Mountain?

*A. Only with regard to Rolling Road.*

(Emphasis added). He continued:

Q. So when [the January 10 Draft] was presented to you with this language, there was an issue that was addressed as to what the terms would be if [Respondent] attempted to negotiate but was unsuccessful, right?

A. It is a strange word. *I was under the assumption that he was negotiating.*

(Emphasis added). Even though the February 8 email indicated that Catonsville Eye was no longer interested, "negotiations restart[ed] . . . the next day." Dr. Gray further testified that his expectation of representation continued through the April 4 Lease signing:

*Q. Okay. Was it still your understanding at this point that [Respondent] intended to negotiate an early end to your Rolling Road lease?*

*A. That is what we believed, that he was negotiating an early end.*

Q. Okay. Did [Respondent] say anything about your Rolling Road lease negotiations during this meeting in April 4?

A. No.

Q. Did [Respondent] ever specifically say to you that he would not be representing you for purposes of those lease negotiations?

A. Yes, he said he was not representing us with regard to 6567.

Q. Okay. Let me rephrase the question. *Did [Respondent] ever explicitly tell you he would not be representing you as to the lease negotiations with the Rolling Road landlord?*

*A. No, he never said that.*

(Emphasis added).

Based upon the communications between Respondent and Drs. Gray and Fine, "it was reasonable for the hearing judge to presume the existence of an attorney-client relationship, thereby triggering Respondent's obligations to advise accordingly[.]" *Att'y Grievance Comm'n v. White*, 448 Md. 33, 54, 136 A.3d 819, 831 (2016). "The hearing judge's determination as to whether an attorney-client relationship existed between the [R]espondent and [client] will not be overturned by us unless the [P]etitioner demonstrates that the [hearing] judge's finding was clearly erroneous." *Att'y Grievance Comm'n v. Shoup*, 410 Md. 462, 490, 979 A.2d 120, 136 (2009) (citations omitted). This is especially true if "[t]here is ample evidence in the record to support the hearing judge's conclusion." *Id.*, 979 A.2d at 136. The purported client's "testimony is a key factor in a court's attorney-

43

client inquiry." *Id.*, 979 A.2d at 136 (footnote omitted) (recognizing that the potential client "never intended for the [R]espondent to provide her with legal services[]").

Based on Dr. Gray's testimony, it is clear that Catonsville Eye *did* expect and reasonably believe Respondent to take further action to secure an early termination of that lease. The testimony and record reveals that there was still an attorney-client relationship between Respondent and Catonsville Eye after the February 8 email. *See id.* at 490, 979 A.2d at 136. Dr. Gray's testimony was a "key factor in [the] court's attorney-client inquiry." *Id.*, 979 A.2d at 136 (footnote omitted). The "clearly erroneous standard" is met where the hearing judge's factual findings are supported by "any competent material evidence." *Att'y Grievance Comm'n v. Ambe*, 466 Md. 270, 286, 218 A.3d 757, 766 (2019); *Att'y Grievance Comm'n v. Wemple*, 479 Md. 167, 191, 277 A.3d 427, 441 (2022). As we explained in *Hodes*:

> [T]he term "clear and convincing" evidence means that the witnesses to a fact must be found to be credible, and that the facts to which they have testified are distinctly remembered and the details thereof narrated exactly and in due order, so as to enable the trier of the facts to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue. Whether evidence is clear and convincing requires weighing, comparing, testing, and judging its worth when considered in connection with all the facts and circumstances in evidence.

441 Md. at 169 n.15, 105 A.3d at 553 n.15 (citations omitted). It was enough for the hearing judge to rely on Dr. Gray's testimony to establish this fact.

Furthermore, Respondent "never expressed, in writing or otherwise," a "lack of consent" to assist Catonsville Eye; rather, his actions—including acceptance of the $1,000 check to review the Rolling Road lease and continued strategy discussions on how to

terminate the Rolling Road lease—evidenced his intent to provide legal services to Catonsville Eye. *See Agbaje*, 438 Md. at 729, 93 A.3d at 281. Respondent was required to "dispel" Catonsville Eye's "reasonable expectation of legal representation[,]" but the record reveals that "Respondent took no such action." *See id.*, 93 A.3d at 281. Upon consideration of the testimony, communications, and lease drafts, the hearing judge found Dr. Gray's testimony to be credible. Therefore, we cannot say the hearing judge was clearly erroneous. *Shoup*, 410 Md. at 490, 979 A.2d at 136 (citations omitted).

Assuming, *arguendo*, Catonsville Eye was a prospective client as to the second component. In this scenario, Respondent *still* violates MARPC 19-301.7. Respondent violated MARPC 19-301.7 by virtue of his ownership interest in MAH Mountain and representation of MAH Mountain in negotiating a new lease with Catonsville Eye while concurrently reviewing the Rolling Road lease for Catonsville Eye and opining on its termination date. Dr. Gray testified that Respondent never disclosed this conflict upon rendering his December 17 "legal advice[:]"

> Q. And *did you also know at this time that [Respondent] had an ownership or a financial interest in MAH Mountain?*
>
> A. No.
>
> Q. Okay. And looking at the section that says "this is legal advice, it is subject to attorney-client privilege, I cannot even share this review with my father, although you can." When you read that, *did you believe that [Respondent] was providing you with legal advice?*
>
> A. Yes.

45

Q. And were you -- *did he advise at this time of any conflict of interest that he may have had in providing you legal advice about your Rolling Road lease?*

*A. No.*

(Emphasis added). Following the December 20 email, Dr. Gray testified as follows:

Q. And [Respondent] states in the next -- a couple sentences down, "obviously I have a conflict of interest in reviewing the new lease for you." Do you see that?

A. Yes.

Q. *And did you understand that to mean that he couldn't provide you legal advise about the Rolling Road lease?*

*A. No.*

Q. What did you understand that to mean?

A. That he represented his father with regard to the 6567 lease location.

Q. Okay. *And [Respondent] did not at this time explain to you any possible conflicts that could arise from providing you legal advice as to the Rolling Road lease but then separately representing his father as to your negotiations regarding 6567?*

*A. No.*

(Emphasis added).

We agree with the hearing judge that Respondent's representation of Catonsville Eye created a conflict of interest because Catonsville Eye and MAH Mountain were in a directly adverse relationship during lease negotiations. Respondent's failure to adequately explain the conflict deprived Catonsville Eye of the ability to make informed decisions. *Framm*, 449 Md. at 649, 144 A.3d at 844. The alleged "alignment" of MAH Mountain's

46

and Catonsville Eye's business interests created a conflict. It was "immaterial" that the parties had the same goal. *Framm*, 449 Md. at 655, 144 A.3d at 848 ("We do not subscribe to the contention that Mr. Griggs was a mere 'incidental beneficiary' because his and Mr. Wilson's interests were in fact aligned."). "[C]oncomitant with the rule against conflicts of interest is the duty of loyalty." *Att'y Grievance Comm'n v. Woolery*, 462 Md. 209, 238, 198 A.3d 835, 852 (2018) (internal quotation marks omitted). Respondent owed a duty to Catonsville Eye to provide unbiased and objective advice. Therefore, when Respondent told Dr. Gray there was "ZERO basis" for the Rolling Road landlord to claim that the lease terminated on December 31, one cannot help but wonder whether Respondent would have projected such certitude if he did not have a personal and professional interest in having Dr. Gray believe that the lease terminated on August 31. For the reasons stated above, we agree with the hearing judge that Respondent violated MARPC 19-301.7. We, therefore, overrule the exception.

**MARPC 19-301.8. Conflict of Interest; Current Clients; Specific Rules (1.8)**

MARPC 19-301.8 provides in relevant part:

**(a)** An attorney shall not enter into a business transaction with a client unless:

(1) the transaction and terms on which the attorney acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing in a manner that can be reasonably understood by the client;

(2) the client is advised in writing of the desirability of seeking and is given a reasonable opportunity to seek independent legal advice on the transaction; and

(3) the client gives informed consent, in a writing signed by the client, to the essential terms of the transaction and the attorney's role in the

47

transaction, including whether the attorney is representing the client in the transaction.

The hearing judge determined that Respondent violated MARPC 19-301.8(a) when he, "as part-owner of MAH Mountain, [] entered into a lease agreement with his client Catonsville Eye." Specifically, Respondent failed to: (1) "advise Catonsville Eye . . . of the desirability of seeking independent advice related to the March 24 [L]ease[,]" (2) "give Dr. Gray a reasonable opportunity to seek independent advice prior to signing the April 4 [L]ease,"[8] and (3) "obtain Catonsville Eye's informed consent, in a writing signed by Catonsville Eye, to the essential terms of the transaction and the Respondent's role in the transaction[.]"

Respondent again excepts to the hearing judge's conclusion because he believes "Catonsville Eye was a prospective client." As we just explained, Catonsville Eye was not a prospective client. Given our conclusion above that the record contains clear and convincing evidence that an attorney-client relationship existed between Respondent and Catonsville Eye, we agree with the hearing judge, for the reasons stated above, that Respondent violated MARPC 19-301.8(a).

### MARPC 19-301.9. Duties to Former Clients (1.9)

MARPC 19-301.9 provides in relevant part:

**(a)** An attorney who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the

---

[8] The hearing judge found that, "[h]ad Dr. Gray reviewed the [April 4 Lease] with his own attorney, he would have discovered the Rent Commencement Date clause had been eliminated."

interests of the former client unless the former client gives informed consent, confirmed in writing.

The Comment to MARPC 19-301.9 reads, in relevant part:

[2] . . . The underlying question is whether the attorney was so involved in the matter that the subsequent representation can be justly regarded as a changing of sides in the matter in question.

[3] Matters are "substantially related" for purposes of this Rule if they involve the same transaction or legal dispute or if there otherwise is a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter.

The hearing judge concluded that Respondent violated MARPC 19-301.9(a) "when he filed a lawsuit on behalf of MAH Mountain against his former client, Catonsville Eye, to enforce the terms of the April 4 [L]ease agreement without obtaining written, informed consent from Catonsville Eye." Respondent again excepts to the hearing judge's conclusion because "Catonsville Eye was a prospective client." We reaffirm that Catonsville Eye was not a prospective client, and agree with the hearing judge, for the reasons stated below, that Respondent violated MARPC 19-301.9(a).

The hearing judge determined that Respondent "understood the confidential nature of his legal relationship with Catonsville Eye" based on his December 17 email, where he stated, "this is legal advice, it is subject to attorney-client privilege, I cannot even share this review with my father[.]" Yet, Respondent, simultaneously represented MAH Mountain against Catonsville Eye. Furthermore, the hearing judge determined that "Catonsville Eye and MAH Mountain's interests were 'materially adverse' when MAH Mountain sued Catonsville Eye for failure to pay rent." The hearing judge cited to the

49

District Court's unease regarding Respondent's potential conflict of interest, whereby the District Court postponed trial "to allow [MAH Mountain] to obtain substitute counsel[.]" Lastly, "Respondent was required to obtain written, informed consent from Catonsville Eye before representing MAH Mountain in the litigation[.]"

It is clear that the hearing judge observed the relevant considerations in the record and concluded that there was clear and convincing evidence to support a violation of MARPC 19-301.9. We, therefore, agree that Respondent violated MARPC 19-301.9(a) when he sued Catonsville Eye, on behalf of MAH Mountain, in a substantially related matter without Catonsville Eye's written, informed consent. *See Woolery*, 462 Md. at 239–40, 198 A.3d at 853; *see also Att'y Grievance Comm'n v. Powers*, 454 Md. 79, 104, 164 A.3d 138, 152–53 (2017).

**MARPC 19-301.16. Declining or Terminating Representation (1.16)**

MARPC 19-301.16(a) provides, in relevant part, that "an attorney shall not represent a client or, where representation has commenced, shall withdraw from the representation of a client if: (1) the representation will result in violation of the Maryland Attorneys' Rules of Professional Conduct or other law[.]"

The hearing judge concluded that Respondent violated MARPC 19-301.16(a)(1) "when he undertook the representation of MAH Mountain in the [D]istrict [C]ourt for the failure to pay rent case against Catonsville Eye" in violation of MARPC 19-301.7 and 19-301.8. Respondent excepts to this finding by merely stating that Petitioner failed to establish the violation by clear and convincing evidence.

50

Clear and convincing evidence supports the hearing judge's conclusion that Respondent violated MARPC 19-301.16(a)(1). MARPC 19-301.16 requires "[a]ttorneys [to] withdraw from representation of a client once their interests become 'untenably at odds with [their] client[s'].'" *Att'y Grievance Comm'n v. Shapiro*, 441 Md. 367, 392, 108 A.3d 394, 409 (2015) (quoting *Att'y Grievance Comm'n v. Bleecker,* 414 Md. 147, 173, 994 A.2d 928, 943 (2010)). As previously stated, Respondent violated MARPC 19-301.9(a) when he sued Catonsville Eye on behalf of MAH Mountain. Catonsville Eye and MAH Mountain's interests were materially adverse.

In this case, Respondent's representation, without withdrawal, of MAH Mountain, despite the conflict of interest in violation of MARPC 19-301.7 and MARPC 19-301.8, as the hearing judge concluded, constitutes a violation of MARPC 19-301.16(a)(1). *See Att'y Grievance Comm'n v. Neverdon*, 473 Md. 631, 686, 251 A.3d 1157, 1190 (2021). Other than a conclusory sentence, Respondent offers no basis for concluding that these findings are clearly erroneous. As such, the hearing judge's determination is supported by clear and convincing evidence.

## MARPC 19-308.4. Misconduct (8.4)

MARPC 19-308.4 provides in relevant part:

It is professional misconduct for an attorney to:

**(a)** violate or attempt to violate the Maryland Attorneys' Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;

* * *

51

**(c)** engage in conduct involving dishonesty, fraud, deceit or misrepresentation; [or]

**(d)** engage in conduct that is prejudicial to the administration of justice[.]

The hearing judge determined that Respondent violated MARPC 19-308.4(a), (c) and (d). The hearing judge determined that Respondent violated MARPC 19-308.4(c) when "he assisted his father with the [April 4 Lease and] . . . [when] he knew or should have known [] that Dr. Gray was not aware of the change in lease terms." To the hearing judge, Respondent knew that the Rent Commencement Clause was "critical" to Drs. Gray and Fine, but "unilateral[ly] change[d]" the lease agreement in MAH Mountain's favor. The hearing judge considered Respondent's failure to inform Catonsville Eye about the lease change "self-serving." The hearing judge further determined that all of Respondent's conduct herein also constitutes a violation of MARPC 19-308.4(d). Respondent again excepts to this finding by merely stating that Petitioner failed to establish the violation by clear and convincing evidence.

We have generally held that MARPC 19-308.4(c) "encompasses a broad universe of misbehavior." *White*, 480 Md. at 381, 280 A.3d at 758 (finding an 8.4(c) violation where Respondent "knowing[ly] and intentional[ly] misrepresent[ed]" information to the courts and bar counsel during a disciplinary investigation) (internal quotation marks and citations omitted). "Candor and truthfulness are two of the most important moral character traits of a lawyer." *Agbaje*, 438 Md. at 715, 93 A.3d at 273 (finding an 8.4(c) violation where Respondent persistently displayed a "pattern of dishonesty and deceit toward his client[.]") (citations omitted). A MARPC 19-308.4(c) violation "turns on whether [Respondent's]

52

conceded misrepresentations were made intentionally. Resolution of that question is largely a matter of credibility. We defer to the hearing judge's determination in that respect, particularly when it comes to assessing an attorney's state of mind as to an intent to deceive." *Framm*, 449 Md. at 663, 144 A.3d at 852 (internal quotation marks and citations omitted). Notably, the hearing judge never concluded that Respondent's actions were intentional. The record did not reveal intentional dishonesty or a "pattern of dishonesty and deceit" on behalf of Respondent towards Catonsville Eye. *Agbaje*, 438 Md. at 715, 93 A.3d at 273 (citations omitted); *Att'y Grievance Comm'n v. Collins*, 477 Md. 482, 501, 270 A.3d 917, 928 (2022) (finding an 8.4(c) violation where an attorney made knowingly and intentionally false statements to bar counsel). In fact, the hearing judge determined that "Petitioner did not meet their burden of proving the Respondent acted in an intentionally dishonest manner[.]" Therefore, we sustain Respondent's exception and do not find a violation of MARPC 19-308.4(c).

"It is professional misconduct for an attorney to[] . . . (d) engage in conduct that is prejudicial to the administration of justice[.]" MARPC 19-308.4(d). A lawyer generally violates MARPC 19-308.4(d) "'where the lawyer's conduct would negatively impact the perception of the legal profession of a reasonable member of the public.'" *Collins*, 477 Md. at 510, 270 A.3d at 934 (quoting *Att'y Grievance Comm'n v. Slate*, 457 Md. 610, 645, 180 A.3d 134, 155 (2018)). "When an attorney proves untrustworthy . . . the trustworthiness of every member of the Bar is susceptible to being called into question, thereby diminishing the public's confidence in the legal profession." *Agbaje*, 438 Md. at 733, 93 A.3d at 284 (citations omitted). The hearing judge concluded that Respondent's

underlying conduct was prejudicial to the administration of justice.  We agree. "Respondent, among other professional misconduct, engaged in representation that created a conflict of interest . . . [and] Respondent's conduct erodes the public's confidence in the legal profession and is prejudicial to the administration of justice" in violation of MARPC 19-308.4(d).  *Framm*, 449 Md. at 664, 144 A.3d at 853 (citation omitted); *see also Neverdon*, 473 Md. at 703, 251 A.3d at 1200 (holding that an attorney's failure to advise clients of a conflict of interest or attempt to obtain the client's informed consent to continue representation constituted a violation of 8.4(d)).  "Although we [] conclude[] that [Respondent] did not engage in intentional dishonesty, nonetheless, [Respondent] engaged in a variety of misconduct that the public would not expect from a member of the legal profession[.]"  *Neverdon*, 473 Md. at 703, 251 A.3d at 1200.  This Court, therefore, concludes, by clear and convincing evidence, that Respondent violated MARPC 19-308.4(d).

"It is professional misconduct for an attorney to[] violate or attempt to violate the [MARPC] . . . ."  MARPC 19-308.4(a).  As discussed above, Respondent violated MARPC 19-301.4(a)(1) and (b), 19-301.7, 19-301.8(a), 19-301.9(a), 19-301.16(a)(1), and 19-308.4(d).  Clear and convincing evidence supports the hearing judge's conclusion that Respondent thereby violated MARPC 19-308.4(a).

## AGGRAVATING AND MITIGATING FACTORS

"During an attorney grievance matter, the circuit court may consider the existence of aggravating and mitigating factors."  *O'Neill*, 477 Md. at 656, 271 A.3d at 806.  We

now address the conclusions of the hearing judge regarding the existence of aggravating and mitigating factors.

## Aggravating Factors

In *Attorney Grievance Commission v. Shuler*, this Court articulated twelve aggravating factors to consider in an attorney disciplinary proceeding:

> (1) prior attorney discipline; (2) a dishonest or selfish motive; (3) a pattern of misconduct; (4) multiple violations of the M[A]RPC; (5) bad faith obstruction of the attorney discipline proceeding by intentionally failing to comply with the Maryland Rules or orders of this Court [ ]; (6) submission of false evidence, false statements, or other deceptive practices during the attorney discipline proceeding; (7) a refusal to acknowledge the misconduct's wrongful nature; (8) the victim's vulnerability; (9) substantial experience in the practice of law; (10) indifference to making restitution or rectifying the misconduct's consequences; (11) illegal conduct, including that involving the use of controlled substances; and (12) likelihood of repetition of the misconduct.

443 Md. 494, 506–07, 117 A.3d 38, 46 (2015) (alterations in original omitted). Petitioner has the burden of proving aggravating factors by clear and convincing evidence. Md. Rule 19-727(c).

Petitioner alleged the existence of two aggravating factors: (1) dishonest or selfish motive and (2) substantial experience in the practice of law. The hearing judge found clear and convincing evidence to establish each of the alleged aggravating factors. Respondent, as a partial owner of MAH Mountain, exhibited a selfish motive by pursuing MAH Mountain's interest, "and therefore his own . . . to the detriment of his client, Catonsville Eye." The hearing judge also noted Respondent's substantial experience in the practice of law since he was admitted to the Maryland Bar in 2007. These determinations are supported by clear and convincing evidence.

**Mitigating Factors**

This Court "always consider[s]" mitigating factors "in deciding a disposition in an Attorney Grievance case." *Att'y Grievance Comm'n v. Coppola*, 419 Md. 370, 401, 19 A.3d 431, 449 (2011). In *Attorney Grievance Commission v. Allenbaugh*, this Court provided a list of potential mitigating factors:

> (1) the absence of prior attorney discipline; (2) the absence of a dishonest or selfish motive; (3) personal or emotional problems; (4) timely good faith efforts to make restitution or to rectify the misconduct's consequences; (5) full and free disclosure to [Bar Counsel] or a cooperative attitude toward the attorney discipline proceeding; (6) inexperience in the practice of law; (7) character or reputation; (8) a physical disability; (9) a mental disability or chemical dependency, including alcoholism or drug abuse, where: (a) there is medical evidence that the lawyer is affected by a chemical dependency or mental disability; (b) the chemical dependency or mental disability caused the misconduct; (c) the lawyer's recovery from the chemical dependency or mental disability is demonstrated by a meaningful and sustained period of successful rehabilitation; and (d) the recovery arrested the misconduct, and the misconduct's recurrence is unlikely; (10) delay in the attorney discipline proceeding; (11) the imposition of other penalties or sanctions; (12) remorse; (13) remoteness of prior violations of the M[A]RPC; and (14) unlikelihood of repetition of the misconduct.

450 Md. 250, 277–78, 148 A.3d 300, 316–17 (2016) (quoting *Shuler*, 443 Md. at 506–07, 117 A.3d at 46). Respondent has the burden of proving mitigating factors by a preponderance of evidence. Md. Rule 19-727(c).

The hearing judge found that Respondent established the following mitigating factors by a preponderance of the evidence: (1) full and free disclosure to disciplinary board or cooperative attitude toward proceedings; (2) the absence of a prior disciplinary record; (3) a good reputation in the legal community; and (4) the imposition of other penalties or sanctions.

Respondent was "fully cooperative with the Commission throughout the disciplinary process." Prior to these proceedings, Respondent had no attorney disciplinary matters brought against him. Respondent was a member of the Maryland State Bar Association and the Baltimore County Bar Association. He is currently a member of the Howard County Bar Association, having previously served as President and currently serving on its Board of Directors. And, as the hearing judge found, Respondent "has a reputation for hones[ty] and integrity in the legal community." Respondent volunteers his time with the Howard County Bar Association, whereby he established a "lawyer referral program" to "better serve" the county's citizens. Therefore, we likewise conclude that Respondent has shown, by a preponderance of the evidence, the mitigating factors found by the hearing judge.

## SANCTION

We now consider the appropriate sanction to impose on Respondent for his violations of MARPC 19-301.4(a)(1) and (b) (Communication) (1.4), 19-301.7 (Conflict of Interest – General Rule) (1.7), 19-301.8(a) (Conflict of Interest; Current Clients; Specific Rules) (1.8), 19-301.9(a) (Duties to Former Clients) (1.9), 19-301.16(a)(1) (Declining or Terminating Representation) (1.16), and 19-308.4(a) and (d) (Misconduct) (8.4).

"It is well-established that the purpose of sanctions in attorney disciplinary proceedings is not to punish the attorney." *Att'y Grievance Comm'n v. Keating*, 471 Md. 614, 651, 243 A.3d 520, 543 (2020) (citation omitted). In determining an appropriate sanction, "[w]e are motivated by our obligation to protect members of the public from attorneys who have demonstrated that they are unfit for the practice of law." *Id.*, 243 A.3d

at 543; *Att'y Grievance Comm'n v. Frank*, 470 Md. 699, 741, 236 A.3d 603, 629 (2020) (quoting *Att'y Grievance Comm'n v. Kaufman*, 466 Md. 404, 428, 220 A.3d 316, 330 (2019)); *see also Att'y Grievance Comm'n v. Zuckerman*, 386 Md. 341, 375, 872 A.2d 693, 713 (2005) (noting that a sanction seeks to "protect the public, to deter other lawyers from engaging in violations of the Maryland Rules of Professional Conduct, and to maintain the integrity of the legal profession" (citation omitted)). "[T]he appropriate sanction for [] violation[s] of the [MARPC] depends on the facts and circumstances of each case, including consideration of any mitigating factors [and aggravating factors]." *Zuckerman*, 386 Md. at 375, 872 A.2d at 713 (citations omitted). "[W]e impose a sanction that is commensurate with the nature and gravity of the violations and the intent with which they were committed." *Id.*, 872 A.2d at 713 (internal citations and quotation marks omitted).

Petitioner recommends indefinite suspension with the right to petition for reinstatement in six months. Petitioner asserts this sanction is consistent with prior cases involving misconduct that "did not involve any intentional dishonesty or . . . selfish motive," including *Attorney Grievance Commission v. Olszewski*, 441 Md. 248, 107 A.3d 1159 (2015), and *Keating*, 471 Md. 614, 243 A.3d 520. On the other hand, Respondent asks that, should this Court find a violation, we impose, at most, a reprimand. Respondent argues that *Olszewski* and *Keating* "bear no resemblance to the facts in this case before this Court."

In *Olszewski*, the attorney violated rules relating to competence, diligence, communication, conflict of interest, bar admission and disciplinary matters, declining or terminating representation, fees, safekeeping property, and misconduct arising out of two

58

separate client complaints. *Olszewski*, 441 Md. at 266–70, 107 A.3d at 1169–71. This Court indefinitely suspended the attorney with the right to apply for reinstatement after six months due to the attorney's severe "neglect and inattention" to his clients. *Id.* at 274–75, 107 A.3d at 1174.

In *Keating*, we indefinitely suspended, with the right to apply for reinstalment after six months, an attorney who violated MARPC 19-303.3(a)(1), 19-308.4(a), (b), (c), and (d). 471 Md. at 648–50, 653, 243 A.3d at 541–42, 544. The attorney submitted a client's will for probate despite knowing that the will was not signed by at least two present witnesses as required by law. *Id.* at 636, 243 A.3d at 534. The attorney falsely represented that she witnessed the will when she had signed the will a month after the client's death. *Id.* at 628, 636–37, 243 A.3d at 529, 534. We concluded that the attorney made knowingly false statements to the court by submitting the will without the legally required number of witnesses, and that the attorney's act of perjury and false submission constituted misconduct. *Id.* at 650, 243 A.3d at 542. Despite this, we did not "impose disbarment because of Respondent's genuine attempt to further the client's wishes, absence of prior discipline[,] and high moral character." *Id.* at 653, 243 A.3d at 544. Rather, we determined that an indefinite suspension with a six-month reapplication period appropriately "balance[d] the mitigating factors present [] with the serious violation of dishonesty before a tribunal." *Id.* at 654, 243 A.3d at 545.

We agree with Respondent that *Olszewski* and *Keating* are distinguishable based on the severity of the misconduct reflected in those cases. Unlike *Keating*, Respondent was not dishonest towards the tribunal. *Id.* at 649, 243 A.3d at 41–42. And, unlike *Olszewski*,

59

Respondent did not neglect Catonsville Eye or improperly withhold their funds. *Olszewski*, 441 Md. at 274–75, 107 A.3d at 1174. Respondent's violations are not as severe.

On the other hand, this Court has held that a ninety-day suspension is appropriate where Respondent does not "act with dishonest, deceitful, or fraudulent intent, lacks a prior disciplinary record, . . . and was cooperative with Bar Counsel throughout the investigation[.]" *Ugwuonye*, 405 Md. at 367, 373, 375, 952 A.2d at 235, 240 (finding a violation of MARPC 19-301.1, 19-301.3, 19-301.4, 19-301.5, 19-301.15, 19-301.16(d), and 19-308.4(d) where the attorney "[took] a meritless case, charg[ed] a fee that grossly outweighed the work accomplished, and [engaged in] the overall lack of communication" with the client). We also consider whether "actual harm" was done to the client. *See Att'y Grievance Comm'n v. Edib*, 415 Md. 696, 721, 4 A.3d 957, 972 (2010) (noting that, unlike Mr. Edib, the attorney in *Ugwuonye* caused actual harm when the attorney "took retainer fees from clients, but never pursued their cases[]"); *see also Singh*, 464 Md. at 681, 212 A.3d at 909 (implementing a sixty-day suspension for an attorney who violated MARPC 19-301.3, 19-301.4, 19-301.7, 19-301.8, 19-301.15, 19-404, 19-308.1, and 19-308.4, but did not cause client significant harm). This Court has also issued a sixty-day suspension for an attorney who, among other violations, "inadequately communicated with clients, had a conflict of interest in obtaining a release of liability from his client, and committed misconduct prejudicial to the administration of justice." *Att'y Grievance Comm'n v. Butler*, 426 Md. 522, 527, 44 A.3d 1022, 1025 (2012).

It follows that a sixty-day suspension stayed, followed by a six-month probationary period with conditions, is the appropriate discipline here. With respect to aggravating

factors, the hearing judge found clear and convincing evidence of two: (1) selfish motive and (2) substantial experience in the practice of law. The record does not support the notion that Respondent harbored intentionally dishonest or deceitful motives in his representation of Catonsville Eye. In fact, the hearing judge determined that "Petitioner did not meet their burden of proving the Respondent acted in an intentionally dishonest manner[.]" The hearing judge even determined that Respondent "was sincere in his testimony" and "did not believe there was a conflict of interest."

The hearing judge found at least four mitigating factors, including: (1) full and free disclosure to disciplinary board or cooperative attitude toward proceedings; (2) the absence of a prior disciplinary record; (3) a good reputation in the legal community; and (4) the imposition of other penalties or sanctions. Despite the violations enumerated above, the mitigating factors weigh in Respondent's favor.

We reiterate that "our primary goal is to protect the public and deter future misconduct." *Singh*, 464 Md. at 681, 212 A.3d at 910 (citation omitted). We conclude that a sixty-day suspension stayed, in favor of six months' probation with conditions, is sufficient to deter Respondent from violating the MARPC. *See id.*, 212 A.3d at 910 (citation omitted). This "message can be sent without sidelining for an indefinite period an attorney who has no other record of discipline . . . ." *Id.* at 681–82, 212 A.3d at 910. Therefore, in light of all the circumstances present in this case, including the aggravating and mitigating factors, we conclude that a sixty-day suspension stayed in favor of a six-month probationary period with conditions is the appropriate sanction. The conditions of

Respondent's probation require him to: (1) adhere to the MARPC and (2) complete a CLE on conflicts of interest or general ethics.

## CONCLUSION

For the reasons discussed above, we impose on Respondent a sixty-day suspension, but with the execution of that disposition stayed for a six-month period of probation, subject to the conditions that Respondent adhere to the MARPC and complete a CLE on conflicts of interest or general ethics for his violations of MARPC 19-301.4(a)(1) and (b), 19-301.7, 19-301.8(a), 19-301.9(a), 19-301.16(a)(1), and 19-308.4(a) and (d).

**IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 19-709(d), FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST ALI MANSOURI KALARESTAGHI.**

IN THE SUPREME COURT

OF MARYLAND*

AG No. 48

September Term, 2021

_____

ATTORNEY GRIEVANCE
COMMISSION OF MARYLAND

v.

ALI MANSOURI KALARESTAGHI

_____

Fader, C.J.,
Watts,
Hotten,
Booth,
Biran,
Gould,
Eaves,

JJ.

_____

Concurring and Dissenting Opinion by Gould,
J., which Fader, C.J. and Booth, J. join

_____

Filed: March 14, 2023

* At the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Appeals to the Supreme Court of Maryland. The name change took effect on December 14, 2022.

I respectfully concur in part and dissent in part from the Majority's disposition of this case.

This disciplinary action springs from a commercial landlord-tenant dispute among sophisticated businessmen in which the fundamental personal and business loyalties of all players were known to all. That includes the personal and business loyalties of Respondent. On one side of the business transaction we have an entity called MAH Mountain, LLC ("MAH"), which owned a commercial retail property in Catonsville, Maryland on Baltimore National Pike (the "MAH Property"). MAH was owned by Respondent, Respondent's father Mehdi Kalarestaghi ("Mehdi"), and Respondent's brother. Respondent was also MAH's attorney.

On the other side of the business transaction was Catonsville Eye Associates, LLC ("Catonsville Eye"). Catonsville Eye was owned by Dr. Erick Gray and Dr. Norman Fine. Catonsville Eye was in the optometry business with multiple locations, one of which was in a commercial retail space in Catonsville on Rolling Road. Dr. Gray was primarily in charge of the administrative aspects of the business, with substantial experience signing leases and opening stores.

The business transaction at the core of this matter was a lease agreement made in April 2017, pursuant to which Catonsville Eye leased space at the MAH Property. In December 2016, with Catonsville Eye's lease at the Rolling Road location set to expire sometime within the next year, Dr. Gray began looking at possibilities for relocating the store, and, to that end, identified the MAH Property as a potential new location. In connection with that possibility, Dr. Gray communicated in person and in emails with both

Mehdi and Respondent. Those discussions began in December 2016 and continued sporadically through the beginning of April 2017, culminating in a fully executed lease agreement in April 2017.

Before the new space at the MAH Property was ready for occupancy, Dr. Gray received from MAH a bill for rent due for the months of May through August 2017. The parties' subsequent disagreement over that invoice prompted Respondent, on MAH's behalf, to file a failure to pay rent action in the District Court of Maryland for Baltimore County, which, in turn, prompted Catonsville Eye to sue MAH, Mehdi, and Respondent in the Circuit Court for Baltimore County. Dr. Gray also filed a complaint with the Attorney Grievance Commission against Respondent.

The charges against Respondent stem from his involvement in MAH's efforts to secure Catonsville Eye as a new tenant. At Dr. Gray's request, Respondent reviewed and gave his opinion on the termination date of the Rolling Road lease. Respondent also offered that if Catonsville Eye were to enter into a lease with MAH, he would provide legal services, at MAH's expense, to help negotiate an early termination of the Rolling Road lease to mitigate Catonsville Eye's liability for paying rent simultaneously at two locations.

The hearing judge found that Respondent had an attorney-client relationship with Catonsville Eye in connection with reviewing the Rolling Road lease to render an opinion on its termination date and to negotiate an early termination of that lease, and the Majority overrules Respondent's exceptions as to those findings. The hearing judge also concluded that by virtue of his undisclosed ownership interest in MAH and his simultaneous representation of MAH in lease negotiations with Catonsville Eye, Respondent had a

2

conflict of interest that he failed to adequately disclose and for which he failed to secure waivers. On that basis, the hearing judge concluded that Respondent violated Maryland Attorneys' Rules of Professional Conduct 1.4(a)(1) and (b) (Rule 19-301.4(a)(1) and (b)), 1.7 (Rule 19-301.7), 1.8(a) (Rule 19-301.8(a)), 1.9 (a) (Rule 19-301.9(a)), 1.16(a) (Rule 19-301.16(a)), and 8.4(a), (c), and (d) (Rule 19-308.4(a), (c), and (d)).[1] The Majority upholds each of these conclusions except with respect to the Rule 8.4(c) violation.

I write separately to explain where I agree and where I part ways with the Majority's analysis. The fault-line between our respective views is in how we define the contours and scope of the attorney-client relationship between Respondent and Catonsville Eye. The Majority has deferred to the hearing judge's conclusion that the relationship included both the review of the Rolling Road lease *and* an undertaking to secure an early termination of that lease. In my view, however, the attorney-client relationship existed only for the former: to review the Rolling Road lease and opine on its termination date. That representation was limited in time and scope and was completed no later than January 2017.

That being the case, I concur in part and dissent in part. I concur with the Majority that violations of Rules 1.4 and 1.7 were established by clear and convincing evidence, but not for the reasons found by the hearing judge. I also concur that sufficient evidence

---

[1] Effective July 1, 2016, the Maryland Lawyers' Rules of Professional Conduct, which employed the numbering format of the American Bar Association Model Rules, were renamed the MARPC and recodified without substantive modification in Title 19, Chapter 300 of the Maryland Rules. For ease of reference and comparison with our prior opinions and those of other courts, we will refer to the MARPC rules using the numbering of the model rules, as permitted by Rule 19-300.1(22) and as identified in the paragraph to which this footnote is appended.

establishes violations of Rules 1.9, 1.16, and 8.4(a) and (d).  I explain my rationale in the concurrence section below.[2]

But I disagree with the Majority that Respondent violated Rule 1.8(a).  The hearing judge found a violation of this rule based on the lease executed on April 4, 2017.  However, by that time, Catonsville Eye was a former client, not a current one.  Therefore, Respondent did not enter into a business transaction with a current client as proscribed by this Rule.  I would sustain Respondent's exception to this conclusion.

CONCURRENCE

*Rules 1.4 and 1.7*

The evidence before the hearing judge supported findings that Respondent's simultaneous representation of both parties for a discrete period at the inception of the business discussion created a conflict of interest that was not adequately disclosed and waived.  Specifically, in December 2016, Respondent offered to review the Rolling Road lease for Catonsville Eye and provide an opinion on its termination date.  Drs. Gray and Fine furnished the lease to Respondent for that purpose, and Respondent undertook that review and opined that the lease terminated on August 31, 2017.  An attorney-client relationship existed for that discrete and limited representation.  But that representation ended no later than January 2017.

During that limited and brief representation, Respondent was the attorney for MAH in lease negotiations with Catonsville Eye.  Respondent also owned a membership interest

---

[2] I concur with the Majority's sanction as well.

4

in MAH, which the hearing judge found was not disclosed to Drs. Gray and Fine. Respondent did not perceive a conflict of interest at that time because the business interests of his two clients—MAH and Catonsville Eye—appeared to be aligned. That is, both MAH and Catonsville Eye were interested in the latter becoming a tenant of the former. Respondent's analysis of the Rolling Road lease termination provisions was undertaken in furtherance of both parties' mutual objective.

MAH and Respondent knew that Drs. Gray and Fine wanted to avoid simultaneously paying rent for two spaces. In December 2016, Dr. Gray forecasted that if they signed a lease in January for MAH's space, the new space would be ready for occupancy sometime in May or June 2017. If the Rolling Road lease ran through December 31, 2017, Catonsville Eye would have been facing the prospect of paying double rent for six months. A lease termination date of August 31 would save four months of double rent, making a lease with MAH more financially palatable. In December 2016, therefore, it was in both sides' interests for the lease to terminate on August 31 instead of December 31.

Usually, determining a lease termination date is not a tricky task. One simply looks at the lease to see when, under its plain terms, the tenancy ends. But Respondent identified what he perceived to be an ambiguity based on the lease termination and rent payment provisions, from which an argument could be made that the lease terminated on August 31. The alignment of business interests notwithstanding, when Respondent agreed to that limited representation, he had a duty to provide objective and unbiased advice to Catonsville Eye. When Respondent advised Drs. Gray and Fine—with a measure of certainty one usually does not see when a sophisticated attorney such as Respondent

5

advises clients on their rights under ambiguous contract provisions—that the lease terminated on August 31, Respondent was providing the answer that best served his personal interests as well as those of his clients. He was giving the answer everyone at that time wanted to hear.

Respondent had a duty to explain to Catonsville Eye that MAH had an interest in the outcome of his analysis of the Rolling Road lease, that he had personal, financial, and fiduciary ties to MAH, and that therefore, the objectivity of his review and analysis of the Rolling Road lease could, albeit unintentionally, be compromised. Upon such advice, Catonsville Eye could have made an informed decision on whether to sign a written conflict of interest waiver as required by Rule 1.7 and thereby engage Respondent for the lease review notwithstanding the potential conflict of interest. On this limited basis, I concur that Respondent violated Rules 1.4 and 1.7, and consequently, Rule 8.4(a) and (d) as well.

*Rules 1.9 and 1.16*

In December 2017, when Respondent filed the failure to pay rent action against Catonsville Eye, Catonsville Eye was Respondent's former client. Rule 1.9 governs an attorney's ability to represent one client in a matter adverse to a former client:

> An attorney who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing

Thus, the issue here is whether the failure to pay rent action that Respondent filed on behalf of MAH was "substantially related" to Respondent's prior engagement to review the Rolling Road lease and opine on its termination date. Comment [3] to Rule 1.9 explains

6

that "[m]atters are 'substantially related' for purposes of this Rule if they involve the same transaction or legal dispute or if there otherwise is a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter." There is no evidence in the record, and the hearing judge cites none, that Respondent acquired any confidential information in his limited representation of Catonsville Eye, let alone confidential information that he either used or could have used to MAH's advantage in the subsequent litigation. However, because Respondent's review of the Rolling Road lease was, in fact, intertwined with (and undertaken in furtherance of) MAH's lease negotiations with Catonsville Eye, one could plausibly conclude that the two matters involve the same transaction. Although I do not believe this to be the case, I cannot say that the record evidence is insufficient to justify such a conclusion. I therefore reluctantly concur with the Majority as to its disposition of the charges under Rules 1.9 and 1.16.[3]

<u>DISSENT</u>

I disagree with the Majority's conclusion that clear and convincing evidence established that Respondent was engaged by Catonsville Eye to negotiate or seek by other means an early termination of the Rolling Road lease. Therefore, to the extent the Majority

---

[3] Under the circumstances of this case, Respondent's violation of Rule 1.9 also constitutes a violation of 1.16, which prohibits an attorney from undertaking a representation in violation of another Rule. Also, these violations support the violations found under Rule 8.4(a) and (d).

7

relies on the existence of an attorney-client relationship in that respect to establish violations of Rules 1.4, 1.7, 1.8[4] and 8.4(a) and (d), I dissent.

Petitioner had the burden of proving by clear and convincing evidence that an attorney-client relationship existed between Respondent and Catonsville Eye. As stated before, the hearing judge found such a relationship in two respects: (1) review of the Rolling Road lease and rendering a legal opinion on its termination date; and (2) representation of Catonsville Eye in negotiations with the Rolling Road landlord to achieve an early termination of that lease. The hearing judge also concluded that the attorney-client relationship lasted from December 2016 to April 2017. However, the evidence does not clearly and convincingly establish an attorney-client relationship with respect to securing an early termination of the Rolling Road lease.

"An attorney-client relationship is formed when . . . a person manifests to a lawyer the person's intent that the lawyer provide legal services for the person . . . and . . . the lawyer fails to manifest lack of consent to do so, and the lawyer knows or reasonably should know that the person reasonably relies on the lawyer to provide [legal] services." *Att'y Grievance Comm'n of Maryland v. Agbaje*, 438 Md. 695, 727 (2014). Petitioner failed to adduce any evidence, much less clear and convincing evidence, that Catonsville Eye manifested an intention for Respondent to proceed with efforts to secure an early lease termination. Nor is there any evidence, let alone clear and convincing evidence, that

---

[4] The hearing judge found a violation of this rule based on the lease executed on April 4, 2017. However, by that time, Catonsville Eye was a former client, not a current one. Therefore, Respondent did not enter into a business transaction with a client. I would sustain Respondent's exception to this conclusion.

Respondent said or did anything to cause Catonsville Eye to believe that he would proceed with such efforts in the absence of a signed lease with MAH.

In elaborating on the clear and convincing evidence standard, we have previously stated that

> the term "clear and convincing" evidence means that the witnesses to a fact must be found to be credible, and that the facts to which they have testified are distinctly remembered and the details thereof narrated exactly and in due order, so as to enable the trier of the facts to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue. Whether evidence is clear and convincing requires weighing, comparing, testing, and judging its worth when considered in connection with all the facts and circumstances in evidence.

*Attorney Grievance Comm'n of Maryland v. Mooney,* 359 Md. 56, 79 (2000) (quoting *Berkey v. Delia,* 287 Md. 302, 320 (1980)). In my view, the Majority relaxes the clear and convincing standard by sustaining the hearing judge's findings so long as there was some testimony from Dr. Gray that could be interpreted as supporting the findings. But to satisfy this exacting standard, the testimony must be capable of being found credible "when considered in connection with all the facts and circumstances in evidence." That is particularly so in this context, where the underlying dispute concerned an arms-length business transaction in which sophisticated businessmen knew how to protect their interests through contracts. In other words, self-serving or vague testimony that cuts against basic common business sense and other undisputed evidence does not satisfy the clear and convincing standard.

A prime example of the Majority's relaxed application of the clear and convincing standard is its treatment of Exception Twelve, in which Respondent excepts to the finding

9

that Dr. Gray was not prepared to sign the April 4 lease when he went to Mehdi's office. Dr. Gray, however, contradicted himself on this point. In Dr. Gray's complaint to the Commission that instigated these proceedings, he alleged that he "intended on April 4 to go and sign a lease and present a check." At the hearing, however, he testified that he did *not* intend to sign a lease when he went to MAH's office on April 4, but only signed the lease and tendered the security deposit check out of deference to his friendship with Mehdi. The hearing judge recognized the contradiction in Dr. Gray's account and expressly questioned his credibility on this point. In doing so, the hearing judge observed that Dr. Gray "is an experienced businessman and has signed numerous leases." Yet, notwithstanding the doubts about his credibility, the hearing judge made findings aligned with Dr. Gray's testimony regarding the circumstances behind the April 4 lease signing. And even though there was no other evidentiary support for those findings, the Majority sustains them out of a misplaced deference to the hearing judge. In my view, if a factfinder determines that certain testimony lacks credibility, then such testimony cannot support a factual finding under the clear and convincing standard. *Mooney,* 359 Md. at 79 (explaining that clear and convincing means "a clear conviction, without hesitancy, of the truth of the precise facts in issue") (quoting *Berkey v. Delia,* 287 Md. 302).

An exacting examination of the evidence is required when the clear and convincing standard is applied. That means that the communications among the parties must be evaluated in the specific business context in which they occurred. The business context in December 2016 when Dr. Gray first contacted MAH, was very different than the context in April 2017, when he signed the lease with MAH. In December 2016, the business

decision facing Catonsville Eye was whether to renew its existing lease on Rolling Road or relocate to new space. Moving the location of a business—particularly an optometry practice that requires the removal and/or installation of inventory, medical supplies, and equipment—entails numerous moving parts. Sequencing the events necessary to accomplish a move that minimizes business interruption and the risk of simultaneously paying rent to two landlords is challenging to any business, and that challenge was foremost in the minds of Drs. Gray and Fine. As such, as the parties' December 2016 emails show, the doctors' business objective was to align, as closely as possible, the termination of their Rolling Road lease with the commencement of their obligation to pay rent at the MAH location. And if they were going to make the move, Drs. Gray and Fine wanted MAH to absorb the risk if those dates could not be aligned.

The termination date of the Rolling Road lease was only one variable in their risk equation. The other variables included the timing of (i) signing a lease for MAH's space, (ii) the delivery of that space to Catonsville Eye for a build-out, and (iii) the completion of the build-out and opening of the new location. The December 2016 emails reflect that the parties, including specifically Dr. Gray, were negotiating under the premise that the MAH lease would be signed in mid-January, that the build-out would take approximately four months, that the new space would be ready to open in May or June, and that the Rolling Road lease would terminate at the end of August.[5] Thus, at that point in time, the parties

---

[5] Regarding the lengthy build-out process, Dr. Gray wrote in a December 6, 2016 as follows:

contemplated the possibility of several months during which Catonsville Eye may have been subject to paying rent for both locations. It was also in that context that Respondent offered his services to negotiate an early termination of the Rolling Road lease and that MAH offered to pay up to $5,000 in fees for such services. All of these discussions took place in December 2016, and every statement made by Respondent or Dr. Gray about securing an early lease termination was expressly linked and conditioned upon Catonsville Eye executing a new lease with MAH.

Respondent explained in December 2016 that his strategy to negotiate an early termination of the Rolling Road lease would be to "disturb and disrupt" the landlord. When asked by his client what that meant, Respondent explained that it meant "put[ting] the landlord in a position that the issues raised by [Catonsville Eye] (through their attorney)

---

When do you truly expect to get your [use and occupancy permit.] My lead time on cabinetry is 4 months[.] Assuming I had my attorney review the lease. And we both acted quickly. Realistically a final lease would be signed mid January. Architecturally plans will take some time even if I absorbed the risk of expense based on good faith . . . . Construction for my space realistically begins February 1 and takes approximately 40 days. Except for the cabinets !! With blueprints in hand cabinet fabrication and installation won't be until May. I am as of last week remodeling [G]ambrills. The approved cab design was signed off for December 1. Installation is anticipated in April. Optometric frame displays are unique and with only a few suppliers I was told by the owner my job represents order number 180. I too do believe your location represents a much better location. I appreciate the quality of appearance and the small business retail compassion. Obviously and fairly I'm looking for rent commencement within 15 days of opening, understanding I'm giving by paying architect fees to expedite my opening. I will make a business decision by Monday at the latest assuming your agreeable to the timing. Thanks Erick

12

become so taxing to respond to that [it] is simply easier and wiser financially and from a business standpoint to simply allow [Catonsville Eye] to leave." Drs. Gray and Fine had made no final decision to relocate to MAH's property at any time in December, January, February, or March. There is no evidence that Dr. Gray expected, let alone reasonably expected, Respondent to engage in such tactics *before* a lease with MAH was finalized and signed. The very notion that Dr. Gray—a sophisticated businessman—would burn his bridges with his current landlord before making the business decision to relocate is irrational.

In fact, on February 8, 2017, Dr. Gray informed Respondent that he and Dr. Fine decided *not* to relocate:

> Dr. Fine has voted not to relocate to your site for the valid reason of age. Norman believes he will not benefit quick enough to justify the build out expense. I can't argue his perspective. Therefore I can only thank you both for your professionalism and kind manner in our negotiations. If you have any other suggestions we are willing recipients. Thank you both. Erick.

Based on this email, there can be no question that, as of *that* snapshot in time, Catonsville Eye did not expect *any* further opinions from Respondent as to the Rolling Road lease termination date or for Respondent to take *any* steps to secure an early termination of that lease. And even though Dr. Gray subsequently resumed discussions with Mehdi, there is no evidence that, at any time after February 8, Dr. Gray had any expectation that Respondent would provide *any* legal services, let alone that Respondent

13

would attempt to secure an early termination of the Rolling Road lease, in the absence of a finalized deal with MAH.[6]

At most, after Dr. Gray's talks with Mehdi resumed, Dr. Gray had an expectation that *if* Catonsville Eye signed a lease with MAH, and *if* the timing of the opening of the new location was such that an early termination of the Rolling Road lease would be appropriate or necessary, Respondent stood ready and willing to represent Catonsville Eye in that effort, at MAH's expense (capped at $5,000). In other words, there was never anything more than the *potential* for an attorney-client relationship between Respondent and Catonsville Eye with respect to securing an early termination of the Rolling Road lease.

The March 24, 2017 proposed lease forwarded by Respondent does not change this analysis. The clause discussing the $5,000 of legal services to negotiate an early termination of the Rolling Road lease was merely an offer to provide legal services in the

---

[6] Relying on select excerpts of Dr. Gray's testimony, the Majority contends that after February 8, "it is clear that Catonsville Eye *did* expect and reasonably believe Respondent to take further action to secure an early termination of that lease." Slip op. at 42. In my view, although one could possibly interpret his testimony to suggest that he expected Respondent to negotiate the termination of the Rolling Road lease, neither the questions nor his responses were sufficiently precise to satisfy the clear and convincing standard that he had such an expectation *in the absence of a lease with MAH*. The questions and his responses related to email exchanges that clearly linked Respondent's agreement to negotiate an early termination of the Rolling Road lease to execution of a lease between MAH and Catonsville Eye. Thus, Dr. Gray's testimony should be viewed in that light. As I read the entirety of his testimony, Dr. Gray merely conveyed that from his perspective as a businessman, if Catonsville Eye was going to sign a lease with MAH, Respondent would be his lawyer to negotiate an early termination of the Rolling Road lease. At no time did Dr. Gray testify that he wanted or expected Respondent to begin such efforts in the absence of a lease with MAH, and for the reasons explained above, any such expectation would have been unreasonable in any event.

14

context of a new lease with MAH. There is no evidence that Catonsville Eye ever accepted *that* offer or authorized Respondent to proceed with such negotiations in the absence of a signed lease. Nor is there any evidence that Respondent ever indicated his consent to undertaking such a representation in the absence of a lease with MAH. And, although the hearing judge made a factual finding that Dr. Gray signed the March 24 version of the lease, that finding was not supported by clear and convincing evidence.[7]

As noted above, business discussions must be understood in their proper context. By the time Dr. Gray signed the lease with MAH on April 4, the business context had changed for Catonsville Eye. In December 2016, Dr. Gray's business concern was that the new space would be ready up to five months *before* his existing lease terminated, leaving Catonsville Eye exposed to double rent during that time. So Dr. Gray welcomed Respondent's legal opinion that the existing lease terminated on August 31 (as opposed to December 31), and if Respondent could secure a termination prior to August 31 by "disturbing and disrupting" the landlord, even better.

---

[7] The hearing judge erroneously found that "[b]oth Petitioner and Respondent agree that on April 4 Dr. Gray signed the March 24 lease agreement which contained the Rent Commencement Date clause and commenced on April 1, 2017." The record evidence, however, includes no version of the March 24 lease that contains the parties' signatures. Further, on cross-examination, Dr. Gray acknowledged that he did *not* sign the March 24 lease, and Respondent testified that he did not know if the parties signed that version. And finally, Dr. Gray could not recall any contact with Respondent between March 24 and April 4. Accordingly, there is no clear and convincing evidence that the March 24 version of the lease was ever signed by Dr. Gray. Nor is there any evidence that, after receiving the March 24 lease, Dr. Gray manifested an intent for Respondent to proceed with the task of securing an early termination of the Rolling Road lease. *See Agbaje*, 438 Md. at 727.

But by April, 2017, the timing considerations had changed. Dr. Gray testified that the build-out of the new space was anticipated to take six to 12 weeks, and the fabrication of the cabinetry could take three to four months. When Dr. Gray signed the lease in April, he knew he could not begin the build-out until MAH obtained the use and occupancy permit, which MAH did not then have, and would not have until June 5. The hearing judge found that Dr. Gray started the build-out after June 5, which meant that Dr. Gray understood that the new space would not be ready by August 31. Thus, when he signed the lease with MAH, there would have been no business purpose in terminating the Rolling Road lease *prior* to August 31. Indeed, if Dr. Gray genuinely trusted Respondent's legal opinion that the lease ended on August 31, he would have been more concerned about extending the lease, not prematurely terminating it. Viewed in that light, it is not surprising that the evidentiary record lacks *any* evidence of *any* communication, at *any* time, from Dr. Gray to Respondent inquiring about the status of Respondent's negotiations with the Rolling Road landlord.[8]

Because clear and convincing evidence does not establish that Respondent was retained by Catonsville Eye to secure an early termination of the Rolling Road lease, rule violations predicated on that erroneous finding were likewise not established. Thus, to the

---

[8] That's not to say that paying double rent was no longer a business concern for Dr. Gray. Clearly it was, as it would be for any reasonable businessperson. But at that point, the business remedy to abate that risk would not have come from an early termination of the Rolling Road lease, but rather from rent concessions from MAH. That is, Catonsville Eye's business interest at that time was to continue operating out of the Rolling Road location until the new space was ready. There is no evidence that after April 4, 2017, Respondent's services for negotiating an early termination of the Rolling Road lease were either needed or contemplated.

16

extent the hearing judge concluded that Respondent violated Rules 1.4, 1.7, and 1.8 based on the existence of an attorney-client relationship in that respect, I would sustain Respondent's exceptions.

For the foregoing reasons, I respectfully concur in part and dissent in part to the Majority's opinion. Chief Justice Fader and Justice Booth authorize me to state that they join in this opinion.